In re HOLOCAUST VICTIM ASSETS LITIGATION.

This Document Relates to: All Cases.

Nos. CV–96–4849(ERK)(MDG), CV–99–5161, CV–07–461.

United States District Court, E.D. New York.

April 2, 2004.

Burt Neuborne, New York University Law School, New York City, lead class counsel.

Susan Sommer, LAMBDA Legal Defense and Education Fund, New York City, for the Pink Triangle Coalition.

Sid Wolinsky, Oakland, CA, for the Disability Rights Advocates.

Roger M. Witten, Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM & ORDER

KORMAN, District Judge.

I write here to address another allocation issue that has arisen in connection with the settlement of this class action, the background of which is set forth at *In re*

*Holocaust Victim Assets Litigation,* 105 F.Supp.2d 139 (E.D.N.Y.2000). In an order dated November 17, 2003 I adopted the Special Master's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds (hereafter "Interim Report"), and I explained my reasons for that decision at *In re Holocaust Victim Assets Litigation,* 302 F.Supp.2d 89 (E.D.N.Y. 2004). In my memorandum and order of March 9, 2004, I also responded to several types of objections to the allocation scheme that has governed the distribution of excess funds in this case. Now I respond to one more—this time the objectors argue that not all unclaimed funds should be distributed to needy survivors of the Holocaust.

The Pink Triangle Coalition, an international coalition formed to advocate for homosexual victims of the Nazis, filed a joint objection and proposal for the distribution of residual funds. Briefly, the Coalition "objects to the Special Master's Recommendation to the extent it inadequately accounts for the tragic historical record of Nazi persecution and post-war repression of homosexual class members," and proposes an alternative *cy pres* distribution. Memorandum in Support of Joint Objection and Proposal of the Pink Triangle Coalition in Response to the Special Master's October 2, 2003 Recommendation, at 27 (hereafter "Pink Triangle Memorandum"). The Special Master's recommendation was that $60 million in excess funds be reallocated to the Looted Assets Class for distribution to the neediest survivors of Nazi persecution and that I solicit proposals for the distribution of any possible unclaimed residual funds. The Pink Triangle Coalition claims that this recommendation fails to adequately account for homosexual victims because homosexual victims are nearly impossible to identify and thus have not often been among the needy survivors receiving settlement funds. It requests that in order to adequately account for homosexual victims, 1% of excess funds be allocated not to needy survivors, but to programs devoted to research and education regarding the plight of homosexuals in the Nazi era and its aftermath.

Similarly, the Disability Rights Advocates (DRA), a non-profit law center founded to represent individuals with disabilities, has filed a Proposal for *Cy Pres* Award For the Class of "People who are Physically or Mentally Disabled or Handicapped" From the Allocation of Residual Unclaimed Funds. (Hereafter "DRA Proposal"). The DRA claims that although "[m]en, women and children with physical, mental, and emotional disabilities were subject to appalling acts of persecution during the Holocaust," these victims have been cut off from society and have thus not adequately benefitted from compensation programs. It contends that without a separate *cy pres* distribution, "the disabled victim class are at risk of failing to fairly benefit from the distribution of this extraordinary settlement." DRA Proposal, at 4. As a solution, the DRA requests that between 2% and 3% of all residual funds be allocated not to needy survivors, but to a "short term Trust that will provide grants to disability oriented, non-profit, non-governmental organizations." *Id.* at 6. While victims of Nazi persecution who were targeted because of a disability could be among the beneficiaries of this "trust," so too could any other disabled individual or disability rights organization. Though the DRA's proposal relates only to residual funds that will not be identified until the Special Master issues a recommendation on April 16, 2004, I address it now because it rests on logic similar to the Pink Triangle Coalition's objection and because my response may provide guidance to the Special Master in formulating his recommendation.

I reject the Pink Triangle Coalition's joint objection and proposal and the DRA's proposal. I have already documented the tremendous need that currently exists among survivors. *See · In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89. Needs exist among all survivor groups in all regions. For Jewish survivors in the Former Soviet Union, the President of the United Jewish Communities has described the nature of the poverty they face:

> I have seen severe non-Jewish poverty in my travels, but I had never seen Jewish poverty like this before. After visiting Jewish families living in small two room shacks, sheltering seven to eight people each and heated with coal stoves, I found myself profoundly grateful that we as Jews, through our federations and JDC, have a way to help. Like many of you who have visited the FSU, I had often visited more familiar scenes of shut-ins—older people who are assisted by our hunger relief programs. But here in Kharkov, [in the Ukraine,] the total poverty picture was striking, and the thought that we might lessen our efforts and allocations, well its just unacceptable.

Letter from Steven Schwager to Special Master Judah Gribetz, dated March 4, 2004 (enclosing e-mail from Stephen H. Hoffman, dated January 23, 2004). Dr. Spencer Foreman, the President of Montefiore Hospital and a member of the Board of Directors of the JDC, wrote the Special Master to the same effect after his annual field visit to the FSU. Specifically, he confirmed that adequate medical care is a particular problem.

> Diagnostic testing, specialties services and all but the most urgent hospital care are unavailable to those unable to pay for them, a group that includes virtually all of the Jewish elderly, and even when admitted to a hospital as an emergency out of pocket payment must be made for pharmaceuticals and medical equipment used during the hospitalization! Prescription medications are either unavailable or unaffordable for the average pensioner. Effective care is further strictured by the primitiveness of hospital and polyclinic facilities and by the scarcity of medical equipment, even the most basic items. While limited hospital care is available for trauma and acute medical problems, elderly patients with serious conditions such as stroke are often just sent home to linger bedridden or to die. A patient with a fractured hip, who in the West would be treated with a surgically inserted hip prosthesis and sent home in three days, is treated with traction for weeks then sent home, often with a non-union of the fracture, never to walk again. With the exception of a few major centers in Moscow and St. Petersburg and selected places available only to those who can pay, the services most people receive are at best comparable to those available in the U.S. in the 1950s, and they are in striking contrast to the high-quality care and advanced technologies to which elderly patients in the U.S. and Israel have access on a routine basis and for which, with a few exceptions, governmental or private payment is available.

Letter from Spencer Foreman to Special Master Judah Gribetz, dated January 15, 2004. According to the International Organization of Migration (IOM), for Romani and others living in Central and Eastern Europe, the situation is often the same.

> Eastern and Central Europe is a region where many persons, regardless of age or ethnic[ity], now endure daily living conditions which have worsened considerably since the end of communism. The elderly, and persons 'living on the edge' such as the Roma, have been hardest hit by the universal collapse of state services which once sought, however im-

perfectly, to meet some of their most basic material, social and medical needs. Letter from Delbert H. Field, Jr., to Judge Korman, dated December 4, 2003. The needs of survivors elsewhere, while perhaps not as great, also cannot be ignored. Indeed, considering the level of desperate need among actual survivors of the Holocaust that can be alleviated through distribution of settlement funds, I cannot currently order a *cy pres* distribution aimed more generally at education, research or advocacy.

### The Pink Triangle Coalition's Joint Objection and Proposal

The Pink Triangle Coalition's objection involves the distribution of $60 million in excess funds now reallocated to the Looted Assets Class, and its proposal involves the distribution of any residual funds that may remain after distributions to the Deposited Assets Class. While the final allocation of any residual funds has yet to be determined, the $60 million in excess funds is being distributed by the same principles that governed the initial allocation and distribution of $100 million to the Looted Assets Class in 2001 and the first supplemental allocation and distribution of $45 million to the Looted Assets Class in 2002. In my March 9, 2004 memorandum, I explained at length the distribution scheme that has governed the distribution of these excess funds allocated to the Looted Assets Class. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89. I repeat a portion of that explanation here:

The Looted Assets Class is incredibly large. It consists of:

> Victims or Targets of Nazi Persecution and their heirs, successors, administrators, executors, affiliates, and assigns who have or at any time have asserted, assert, or may in the future seek to assert Claims against any Releasee for relief of any kind whatsoever relating to or arising in any way

from Looted Assets or Cloaked Assets or any effort to recover Looted Assets or Cloaked Assets.

Settlement Agreement, Section 8.2(b). As the Special Master correctly reasoned, "[t]here is scarcely a victim of the Nazis who was not looted, and on nearly an incomprehensible scale." Plan of Allocation, at 111. After all, "it is well accepted by historians, including those representing Switzerland, that a primary purpose of the Nazi plunder was to transform loot (especially, but not only gold) into foreign currency by marketing these items in neutral nations, including Switzerland." *Id.* at 114. "With only limited exceptions, however, the current historical record simply does not permit precise determinations even as to the material losses in total, much less the nature and value of the loot traceable to Switzerland or Swiss entities." *Id.* at 112. To prevent the expenditure of incredible sums on administration, the Special Master recommended that for allocation purposes, I assume that all survivors of the Holocaust and their heirs were valid members of this class, even if they could not prove an injury directly tied to a Swiss entity. I agreed.

I then was faced with two obvious and unsatisfactory possibilities for how to govern the distribution of money to this enormous class. I could have used a claims resolution facility to determine the validity and value of claims on a case-by-case basis, or I could have ordered a *pro rata* distribution to every member of the class. The first option, given the complete lack of adequate records, would have resulted in "an unwieldy and enormously expensive apparatus to adjudicate hundreds of thousands of claims, for losses which can barely be measured and hardly be documented, and whose connection to Switzerland, or

a Swiss entity, if ever it existed, probably no longer can be proven." *Id.* at 114–15. The second option ... was equally problematic.... [F]or allocation purposes, the class includes all those who were victims of the Holocaust *and their heirs.* A *pro rata* distribution would have resulted in the payment of literally pennies to each of the millions of individuals who would fall into this class....

Fortunately, there [was] a more reasonable alternative. The Special Master recommended excluding heirs from any *pro rata* distribution, as was done with the Refugee and Slave Labor classes. While this would have increased the *pro rata* share of survivors, it would still have resulted in one-time individual awards that would not have been enough to provide any assistance to needy survivors and would have been insignificant to those who are not needy. Consequently, I adopted the accompanying recommendation of the Special Master and ordered a *cy pres* remedy targeting the neediest survivors in the Looted Assets Class. *See* Special Master's Interim Report, at 3 n. 3. The Special Master reasoned that these individuals "perhaps would be less in need today had their assets not been looted and their lives nearly destroyed" during the Nazi era. Plan of Allocation, at 117. I agreed that using the funds to provide relief to these neediest survivors over the course of ten years would be the way to most benefit the class as a whole. In order to reduce administrative costs, these funds were funneled through organizations that were already providing relief to survivor communities and could quickly provide aid. I reserved the right to grant other *cy pres* remedies as worthwhile proposals are presented, but my principal decision was consistent with Second Circuit law. *See In re Agent Orange Product Liability Litig.,* 818 F.2d 145, 158 (2d Cir.1987) (explicitly authorizing a district court to "give as much help as possible to individuals who, in general, are most in need of assistance" because it is "equitable to limit payments to those with the most severe injuries"). Indeed, the Second Circuit agreed. *See In re Holocaust Victim Assets Litig.,* 14 Fed. Appx. 132 (2d Cir.2001) (finding that appellants' challenge to my decision to apply the *cy pres* doctrine to the Looted Assets Class "lack[ed] merit").

*In re Holocaust Victim Assets Litig.,* 302 F.Supp.2d at 95–96.

Initially, $100 million was set aside for the neediest survivors of Nazi persecution. Later, that sum was augmented by $105 million from excess funds that had accumulated on the settlement fund. *See id.,* at 90–91. Any further distribution to the neediest survivors will come from the residual funds, if any, that remain unclaimed from the amount set aside for the Deposited Assets Class.

In order to facilitate a speedy and equitable distribution, I ordered that 90% of the funds allocated to the Looted Assets Class be distributed to needy Jewish victims, and 10% be distributed to needy victims who were Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped. The International Organization of Migration (IOM) has handled the distribution of money allocated to needy survivors in the latter categories, and by the time of the Special Master's Interim Report, the IOM had reached over 50,000 such survivors. Interim Report, at 102. Most have been Roma. The IOM has had far less success identifying homosexual targets of Nazi Persecution.

The lack of success in identifying homosexual victims has not been for want of effort. The Special Master reported, "the IOM continues to consult with experts and non-governmental organizations as to how

best to locate and serve needy disabled and homosexual Nazi victims." *Id.* at 105. He continued:

> IOM has been in contact with an interlocutor for homosexual survivors regarding a needs assessment for the provision of HSP [humanitarian] assistance. IOM still awaits a response from this interlocutor, which should include a list of potential beneficiaries, before making additional enquiries in this regard. Since submitting the Supplemental Proposal [of June 10, 2002; approved by Court order dated June 24, 2002], in an effort to reach survivors, IOM has also contacted a further fifty (50) homosexual NGOs, foundations and organizations which work in support of this community throughout Europe. To date the response has been extremely limited.

*Id.,* at 105 n. 147 (citing "Humanitarian and Social Programmes (HSP) Quarterly Report for the Period July–September 2002," dated October 11, 2002, at 12). It has simply been extremely difficult to identify survivors of Nazi persecution who were targeted for victimization because they were homosexual.

The Pink Triangle Coalition readily admits that survivors targeted for being homosexual are hard to find. Indeed, the Coalition itself has only identified seven living needy survivors who were targeted by the Nazis on account of their sexual orientation. *See* Pink Triangle Memorandum, at 16 ("Extensive efforts to locate remaining gay survivors of Nazi persecution have yielded a total of seven needy survivors who remain alive and are willing to come forward."). The Coalition contends only that providing assistance to these seven individuals inadequately represents the amount of suffering inflicted on homosexuals by the Nazis.

The Pink Triangle Coalition Proposal for a *Cy Pres* Allocation for Homosexual Victims of the Nazis extensively chronicles the history of Nazi persecution of homosexuals. The following is a brief summary:

> One goal of the Nazi regime was to suppress all private same-sex sexual activity and all public expression of gay and lesbian culture and community in Germany and the annexed territories. The persecution was far more extreme in its range and severity than that experienced by gay men and lesbians in the pre- and post-Nazi periods in Germany or in other Western European counties. The facts known about the targeting of gay men and lesbians under the Third Reich reveal a pattern of effective and merciless repression. The Nazi regime's campaign to eradicate homosexuality began in 1933 with the deliberate destruction of research centers, cultural resources, businesses, communications media, and social organizations that formed the backbone of the gay community throughout Germany. Historians have estimated that under the Nazi regime as many as 100,000 homosexuals may have been arrested or tracked on the basis of section 175 of the Reich Penal Code, which outlawed not only sexual activity, but even touching, 'looking,' and hugging between men, and of section 179 of the Austrian Penal Code, which criminalized both male and female same-sex intimacy.

> As many as 15,000 gay men were deported as such to concentration camps and compelled to perform slave labor for corporations or for entities owned or controlled by the Nazi regime. A small number of lesbian women also were deported to camps specifically because of their sexual orientation, and some were forced into prostitution in camp brothels. Those interned for their homosexuality were among the most abused in the camps, which abuse, for some, included subjection to heinous medical experi-

mentation, including forcible castration. As many as 9,000 men interned as gay were killed in the camps.

In addition to persecuting individuals, the Nazi regime plundered gay community organizations, meeting places, and centers of political and scholarly activity, and destroyed or stole their assets. Members were arrested, enslaved, tortured and murdered. The Nazis laundered a significant portion of their illegal gains through Swiss banks, likely connecting the spoils with the assets involved in this lawsuit.

Pink Triangle Memorandum, at 7–8. Without question, this is a terrible history, and without question, this history places homosexual survivors squarely within the definition of the Looted Assets Class for allocation purposes. But that alone could be said of all survivors of Nazi persecution.

According to the Pink Triangle Coalition, what makes homosexual victims of Nazi persecution different, and what makes them worthy of a distinct *cy pres* allocation in this case, is their post-war experience. Homosexual victims were systematically excluded from compensation efforts after the Holocaust, and "[i]t was not until 1985 that the first German politician—Federal Republic President Richard Von Weizsäcker—publicly acknowledged that homosexuals were victims of the Nazis and should be remembered as such." Pink Triangle Proposal, at 29. This, of course, is also true of survivors in the Former Soviet Union—who were described by former Deputy Secretary of the Treasury Stuart Eizenstat as double victims who suffered under the Nazis and communism—and a large segment of the Romani survivors. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 94–109. But more specifically, the Pink Triangle Coalition wrote:

After 1945, the circumstances encountered by homosexual survivors of Nazi persecution are unique because homosexual men continued to be singularly and intensively pursued, imprisoned, and persecuted in West Germany until 1969 and Austria until 1971 under the same laws used by the Nazis. Survivors were publicly stigmatized, harassed, silenced, and re-imprisoned; they were excluded from compensation and ignored by elected officials for more than forty years. Similarly, in France, the government failed to recognize homosexual victims from annexed French territory as deportees under the formal support programs put in place after the Liberation.

As a consequence, very few homosexual victims have come forward to seek compensation or claim assets. Moreover, due to the fear of being re-imprisoned, many of the German and Austrian victims did not disclose their homosexuality to their families or the state. Given the post–1945 climate for homosexual victims, it is more than reasonable to presume that many did not inform their families about their sexual orientation and many more did not or were not able to have families of their own. Similar to many of the victims with disabilities, the majority of homosexual victims in all likelihood did not have heirs, successors, administrators, executors, or other affiliates who could act on their behalf to press claims for compensation.

Pink Triangle Proposal, at 32. In sum, because of the precise form of Nazi era and post-war persecution of homosexuals, it is no surprise that the IOM has been unable to find more than a handful of needy homosexual survivors.

As a way to compensate for the IOM's inability to identify individual needy survivors who were targeted because of their homosexuality, the Pink Triangle Coalition asks that 1% of excess and common funds be distributed for a separate *cy pres* reme-

dy encouraging the remembrance of homosexual victims of Nazi persecution as a group. Specifically, the Coalition seeks to advance four initiatives with its proposed *cy pres* allocation:

First, to provide material assistance in the form of a modest monthly pension to the few identified needy gay Nazi survivors still living and to any who may yet come forward.

Second, to support scholarly research into the anti-gay crimes committed by the Nazi regime aimed at locating additional survivors of the persecution and documenting their experience.

Third, to promote the education of students and the general public about the Nazi persecution of gay people.

Fourth, to advance efforts to prevent anti-gay persecution throughout the world today by supporting educational, outreach, and humanitarian programs, in order to prevent repetition of the horrors of the Nazi regime.

Pink Triangle Memorandum, at 2–3.

### The Disability Rights Advocates' Proposal

The DRA's proposal rests on similar doctrinal grounds. It claims that the distributions thus far have not adequately accounted for the suffering of Nazi victims who were specifically targeted because of physical and mental disabilities.

As with homosexual victims of the Nazis, it is undisputed that the Nazis committed unspeakable atrocities against people solely because they were disabled. The DRA summarizes a fraction of the suffering as follows:

Most scholars estimate that a minimum of 275,000 were killed solely because of their disability in the formal euthanasia program in Germany alone (Aktion T–4).... In addition ... the Nazis conducted gruesome 'medical research' on disabled children and implemented a

massive forced sterilization program that effected approximately 400,000 persons with disabilities. The sterilization program was one of the first acts of the Nazi Government which furthered its preoccupation with the ideology of racial hygiene.

DRA Proposal, at 15. Again, this put individuals targeted by the Nazis on account of disability squarely within the definition of the Looted Assets Class for allocation purposes.

As with homosexual victims, however, the IOM has had difficulty identifying these individuals. Some identifications of survivors targeted because of their disabilities are being made. For example, "[t]he IOM recently has advised the Special Master that it is preparing Slave Labor Class I payment recommendations for approximately 45 disabled Nazi victims from Austria and elsewhere, and will analyze these survivors' needs for possible Looted Assets Class humanitarian assistance." Interim Report, at 105 n. 147. But overall, the IOM recounted its lack of success as follows:

[I]n respect of disabled beneficiaries, IOM has contacted twenty three (23) disabled NGOs, foundations and organizations since the submission of the Supplemental Proposal that work in support of this community throughout Western and Eastern & Central Europe in an effort to reach survivors in these categories. The response to date has been equivalent to that in respect of the above outreach in respect of homosexual organizations.

*Id.*, at 105 n. 147.

The DRA acknowledges that victims who were targeted because of disability are difficult to locate. It claims that this is largely because decades of stigmatization have prevented disabled survivors from making their voices heard. The DRA Proposal explains:

This group is extremely difficult to locate, identify or notify not only because they are widely scattered and elderly, but because they tend to be isolated, living in poverty, and institutionalized. The experience thus far in this litigation reflects these factors. The lack of response by men and women with disabilities to the initial Notice of Settlement and the difficulties encountered by the IOM in its effort to locate and identify potential beneficiaries, reflects distressing characteristics of the disabled victim class that have repeatedly resurfaced throughout this litigation: persons with disabilities continue to be segregated from society at large, suffer from social stigma, fail to enjoy the most basic access to their own societies, and continue to suffer from unwarranted prejudice and discrimination.

DRA Proposal at 9. Nevertheless, the DRA contends that the fact that disabled victims are difficult to identify does not relieve me of any duty to compensate them as a group.

The DRA's proposed solution is to place between 2% and 3% of all residual unclaimed funds into a "[t]rust that will provide grants to disability oriented, non-profit, non-governmental organizations" with a goal of "advanc[ing] the human rights of people with disabilities." *Id.* at 6, 43. The DRA would have a significant role in determining the composition of a Disability Holocaust Class Advisory Board, which in turn would administer the trust. *See* Proposed Order for Distribution of Settlement Funds to Establish *Cy Pres* Remedy for Physically or Mentally Disabled or Handicapped, at ¶ 8 (hereafter "DRA Proposed Order"). The DRA argues that such a distribution could "ensure that this settlement addresses the root causes that led to the victimization of persons with disabilities during the Holocaust … [T]he remedy will help eradicate the conditions that made the Holocaust possible for people with disabilities, while at the same time, help educate the world about this neglected corner of history." DRA Proposal, at 7–8.

The DRA recommends that up to 10% of the proposed reallocation of 2%–3% be devoted specifically to grants devoted to disability commemorative, remembrance, and memorial purposes. *See* DRA Proposed Order, at ¶ 17. The funds would go primarily to countries where needy Holocaust survivors reside, but they would in no way be limited to providing direct (or indirect) relief for survivors. Instead, the principal goal would apparently be to improve the social standing of people with disabilities in the countries where they are most marginalized. There would be no explicit connection to the Holocaust required.

### Discussion

I am sympathetic to the fact that homosexual and disabled victims of Nazi persecution, like survivors in the Former Soviet Union and Romani survivors, have not been sufficiently recognized in the decades since the Holocaust. Both groups continue to face unwarranted prejudice and challenges to this day. However, I do not agree that under current circumstances, a *cy pres* distribution for the purpose of education, research, or a general advocacy program to right these wrongs is the appropriate use of excess or residual funds in this lawsuit.

The words *"cy pres"* come from the French expression, *"cy pres comme possible,"* which means "as near as possible." *See Airline Ticket Comm'n Antitrust Litig.,* 307 F.3d 679, 682 (8th Cir. 2002) (citation omitted). Originally, the *cy pres* doctrine developed in the context of testamentary charitable trusts. Where a trust would otherwise fail, a court would attempt to fulfill the testator's charitable intent "as near as possible" rather than let the trust fail entirely. The same basic

notion is now employed in class action settlements such as this one. *See* Newberg on Class Actions, § 10.17 (4th ed.).

> When a litigated or settled aggregate class recovery cannot feasibly be distributed to individual class members or when a balance of a class recovery remains following individual distribution ... the court may direct that such undistributed funds be applied prospectively to the indirect benefit of the class ... The cy pres approach, then, puts the unclaimed fund to its next best compensation use.

*Id.* Put differently, where straightforward distribution would fail to effectuate the remedial purpose of a lawsuit, courts can employ a *cy pres* distribution to effectuate the "next best" distribution. *See Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir.1990) ("Even where *cy pres* is considered, it will be rejected when the proposed distribution fails to provide the 'next best' distribution").

There were several original purposes of this lawsuit. For members of the Deposited Assets Class, it was to recover property once held in Swiss banks that was either improperly transferred to the Nazis or never paid to the account holder. For members of the Refugee Class, it was to achieve some degree of restitution for being refused entry to Switzerland or otherwise harmed by Swiss immigration policies during the Nazi era. For members of the Slave Labor Classes, it was to achieve some degree of restitution for being forced to work for companies that were using Swiss financial institutions to flourish. And for members of the Looted Assets Class, it was to recover the value of assets that were looted by the Nazis and passed through Swiss banks. The original purposes of the first four classes have been roughly achieved, albeit with limited sums of money. But as I explained in my March 9, 2004 memorandum and order, *see*

*In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89, 94–96, trying to precisely fulfill the original purpose in connection with the Looted Assets Class was impracticable.

I decided that distributing funds to the neediest survivors of Nazi persecution would be "next best" distribution solution for the Looted Assets Class. Such a distribution is "as near as possible" to the original purpose of the Looted Assets Class as a court with limited funds can achieve. While the strategy I employed will by no means provide restitution to every member of the plaintiff class, it provides meaningful restitution to those "most in need of assistance." *See In re Agent Orange Product Liability Litig.*, 818 F.2d 145, 158 (2d Cir.1987). I left open the possibility that other *cy pres* distributions could become the "next best" remedy at a later stage in the distribution, *see id.*, but at this point, neither the Pink Triangle Coalition's proposal nor the DRA's proposal warrants deviating from my basic distribution strategy. The Pink Triangle Coalition argues that the solution that would come "as near as possible" to the original purpose of the lawsuit would be to distribute 99% percent of the funds as I have while reserving 1% for a separate distribution to remembrance and education programs dedicated to homosexual victims of the Nazis. The DRA, for its part, argues that the solution is to reserve 2%–3% for a separate distribution for the betterment of people with disabilities. I disagree. Neither of these suggestions is more consistent with the original purpose of the Looted Assets Class than is direct distribution to needy survivors; neither is the "next best" solution.

First, there is a conceptual flaw in both the Pink Triangle Coalition's joint objection and proposal and the DRA's proposal. Both groups recognize (correctly) that ho-

mosexual and disabled targets of Nazi persecution are entitled to distributions through the Looted Assets Class and each of the other classes. But these victims are only entitled to such distributions as individuals—not as a group. There are no sub-classes within the Looted Assets Class or any other class. As I explained in my memorandum of March 9, 2004, there is no United States survivors' share. *See In re Holocaust Victim Assets Litig.,* 302 F.Supp.2d at 108–09. Similarly, there is no homosexual victims' share and there is no disabled victims' share. All victims of the Nazis were presumed looted, and all had an equal right to allocation through the Looted Assets Class. Put differently, the original purpose was to provide restitution to each individual victim, irrespective of why he or she was targeted by the Nazis; thus, the allocation to the Looted Assets Class will be successful or unsuccessful based on how much meaningful restitution it can provide to members of the class, regardless of whether it perfectly reflects the target group breakdown of Nazi victims.

Second, and more importantly, I simply cannot justify either proposed *cy pres* distribution given the current level of need experienced by individual members of the Looted Assets Class. If the settlement fund had unlimited resources, or if the needs of individual survivors were slight, I would agree that remembrance programs such as the one requested by the Pink Triangle Coalition or the advocacy efforts sought by the DRA are an appropriate use of funds. But that is not the reality. In fact, the needs of individual survivors are overwhelming, and the settlement fund is nowhere near sufficient to address them all. As I explained in my decision of March 9, 2004, there are 135,000 identified destitute Jewish survivors in the Former Soviet Union alone, many of whom are in danger of starving without continued assistance. *See In re Holocaust Victim Assets Litig.,* 302 F.Supp.2d at 97–107. The needs of survivors elsewhere, while perhaps not as great, also cannot be ignored. While the numbers are lower, Romani survivors face the same basic plight. The settlement fund has only begun to alleviate this need.

Third, I have no reason to assume that overall, homosexuals and disabled survivors have not received a proportionate share of the total distributions in this case. If a claimant in the Looted Assets Class can successfully show membership in any of the five classes, an award is made; claimants are not required to state what target group they represented or whether they might be in multiple groups. Surely some proportion of the Jewish, Romani, and Jehovah's Witness victims have been homosexual, even if not explicitly identified or targeted by the Nazis as such. While they may not have identified themselves as homosexuals, these survivors had no need to do so when making claims to which they were entitled because they were Jewish, Romani, or Jehovah's Witnesses. Among Deposited Assets claimants, there is a clear record of awards being made based on accounts once held by homosexual victims of Nazi persecution. *See e.g. In re Account of Israel Nagler In re Account of Fritz von Fischer–Ankern; In re Account of Erika Krickton; In re Account of Dimitri Alimantestianu; In re Account of Serafina Meier,* available at *www.crt-ii.org.* In addition, I have taken the step of recognizing homosexual partners as heirs to insure that they would be fairly represented. *See e.g. In re Accounts of Dr. Rafael Dallet,* available at *www.crt-ii.org* (providing an award to a claimant who submitted "documents and specific biographical information, demonstrating that the Account Owner was her godfather and life partner of her great-uncle" even though CRT–I had rejected her claim on the grounds that she was not a proper heir).

418

Meanwhile, not only some, but a vast majority of survivors receiving funds from the settlement have been disabled. The DRA itself concedes that "it is reasonable to assume that well over 90% of all Holocaust survivors are also now persons with disabilities." DRA Proposal at 19. While most of these disabled survivors may not have been originally targeted by the Nazis because of a disability, by the DRA's own admission, these people now "all likely suffer[ ] from the same root cause of prejudice and discrimination experienced by those persons who had disabilities during the Nazi era." *Id.* It is therefore hard to see how this sort of distribution ignores disabled victims of the Nazis. To the contrary, they have been the primary recipients of relief. Indeed it hardly seems debatable that when giving money to people who had assets looted by the Nazis because they were then disabled becomes impossible, the "next best" solution is to give the money to people who had assets looted by the Nazis and are now disabled and suffer the same prejudice.

Finally, I find unpersuasive the argument that homosexual and disabled victims deserve a separate *cy pres* distribution because by virtue of being homosexual or disabled, they were "highly unlikely to have surviving children." Declaration of Burt Neuborne, dated April 1, 2004, at ¶ 7. While it is suggested that this accounts for the fact that "few claims have been filed on behalf of gays and disabled victims by surviving family members," *id.*, it is difficult to accept this premise as a basis for the *cy pres* distribution sought here. As an initial matter, four of the five classes of plaintiffs exclude heirs from any distribution, making the question of whether or not a victim of Nazi persecution had children wholly irrelevant. Heirs are only entitled to distributions from the Deposited Assets Class. More to the point, however, it is simply incorrect to say that homosexual or disabled victims were un-

likely to have had heirs because they were unlikely to have had surviving children. Heirs are not limited to direct descendants, and in distributing funds to the Deposited Assets Class, the Claims Resolution Tribunal has been instructed to use a broad definition of heirs. Indeed, as noted earlier, in a case where a claimant was an heir of the homosexual partner of the owner of an account, she was awarded the proceeds. *See In re Accounts of Dr. Rafael Dallet,* available at *www.crt-ii.org.* Last, to the extent that homosexual and disabled victims of Nazi persecution did in fact die without heirs, that was a tragically commonplace event in the context of the Holocaust, where so many people—including a third of the Jewish population—and entire families were slaughtered. Dr. Norman Lamm, President of Yeshiva University, explained:

Our case is so rare, so unimaginable to previous generations for whom the principle of the ubiquity of Jewish kinsmen was self-evident, that we are indeed in a position to say that in our days, tragically, history has confounded the assumption of the Talmud: vast numbers of Jews did indeed die without heirs.

Norman Lamm, Holocaust Compensation from the Vantage of Jewish Law and Morality, Tradition 35:2, at 9 (Rabbinical Council of America, 2002).

### *CONCLUSION*

The goals of remembrance, education, and advocacy are important, particularly for groups such as homosexuals and disabled victims whose place in the Holocaust is often improperly overlooked. That is why I was willing to consider concrete proposals such as the Pink Triangle Coalition's and the DRA's. But these goals—while explicitly targeted by well-funded foundations such as the German Foundation "Future Fund" and the French Fund—were not the focus of this lawsuit.

They can only come after I am satisfied that life sustaining needs of the neediest victims of Nazi persecution are met. Because so many survivors continue to face life-threatening needs on a daily basis, I cannot now justify ordering the separate *cy pres* distribution requested by either the Pink Triangle Coalition or the DRA. I must continue to give money to needy survivors.

Accordingly, I reject the Pink Triangle Coalition's Joint Objection and Proposal in Response to the Special Master's Interim Report and Recommendation, and I reject the Disability Rights Advocates' Proposal for *Cy Pre* Awards for the Class of "people who are Physically or Mentally Disabled or Handicapped" from the Allocation of Residual Unclaimed Funds. Fundamentally, both primarily seek to advance goals of research, education, and advocacy. While these are worthy goals, they are not goals that can be currently funded by the ever-diminishing settlement fund that resulted from this class action.

**SO ORDERED.**