### In re HOLOCAUST VICTIM ASSETS LITIGATION.

**This Document Relates to All Cases.**

**Nos. CV–96–4849 ERK MDG, CIV–96–5161, CV–97–461.**

United States District Court,
E.D. New York.

June 17, 2004.

Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Holocaust Survivors Foundation-USA, Inc.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM

KORMAN, Chief Judge.

The background of this case is set forth at *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y.2000), and prior discussion of issues pertaining to the distribution process can be found at *In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d 89 (E.D.N.Y.2004) and *In re Holocaust Victim Assets Litigation*, 311 F.Supp.2d 407 (E.D.N.Y.2004). On April 29, 2004, I held a hearing on the distribution of possible residual funds. Professor Thane Rosenbaum, who teaches human rights law and ethics at Fordham Law School, spoke at the hearing.

Prior to the hearing, Professor Rosenbaum repeatedly requested a chance to meet privately with me. He spoke with my law clerk several times and introduced himself as an independent but interested party who had a great deal of influence with the American survivor community. He professed to be concerned that survivors in the United States would protest my allocation decisions and that the resulting picture of Jews battling Jews would do more harm for the legacy of this class action than any allocation decision I made. He urged that if he could only meet with me and "take something back" to the community, he could prevent their protests. When pressed for a definition of what "something" might be, Professor Rosenbaum conceded that it was money he sought: If he could obtain a greater share of settlement funds for the protesting

groups of American survivors, he was confident that he could quell their protests. Because I was holding a public hearing on April 29, 2004, I declined Professor Rosenbaum's requests for a private meeting and instead granted him time to speak at the hearing.

Professor Rosenbaum was initially scheduled to speak at the hearing for approximately five to ten minutes between 2:00 p.m. and 3:00 p.m. His time slot was shortly after the one hour allocated to Holocaust Survivors Foundation–USA ("HSF–USA") for a presentation that had been arranged by its attorney, Samuel Dubbin. Before HSF–USA began its presentation, however, Professor Rosenbaum asked to directly precede HSF–USA's presentation because he had a scheduling conflict with the later time slot that had been assigned to him. He reported that Mr. Dubbin had acceded to his request on behalf of HSF–USA, and I agreed to let him speak earlier than scheduled.

Professor Rosenbaum introduced himself as follows:

My name is Thane Rosenbaum. I am a human rights law professor at Fordham Law School. I'm also a novelist and essayist who writes frequently on Holocaust-related themes. I've just recently published a book on the failure of the legal system to provide moral justice and funding. I'm also a child of Holocaust survivors.

Hearing Transcript, dated April 29, 2004 (Thane Rosenbaum), at 2 (hereafter "Tr."). He then explained his purpose:

I am here today not as a representative of any particular group or organization. I am not asking for money. What I am asking for, however, is the restoring of dignity to this restitution process. The legacy of these proceedings matters a great deal. The precedent it creates,

the impression it leaves, the memory that it honors is, in many respects as important as the money that it distributes. Actually today, I would like to think that I speak on behalf of the dead. *Id.* Later, he reiterated: "[A]s I said in the outset, I am not here on behalf of a running organization or any country for that matter. I am here to speak on behalf of any survivor wherever they lived depending upon what their experiences were and what they lost." *Id.* at 6.

Professor Rosenbaum failed to disclose material facts that cast considerable doubt on his claim that he was speaking independent of any specific group or organization. These facts clearly suggest that Professor Rosenbaum, a latecomer to these proceedings, was seeking to lend the credibility of his position as an academic and a writer to arguments of HSF–USA that I have already shown to be untenable. *See In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d 89.

Specifically, it has recently come to my attention that in the "Acknowledgments" section of one of his recent books, Professor Rosenbaum wrote:

> With the deepest gratitude to so many people who made it possible, and necessary, for me to live, and write and love, who were so generous in so many unending ways, who gave me more than a second thought even when my own thoughts went elsewhere, who watched over me when I neglected myself, and whom I can never repay, not with these words or with anything else, because the spiritual currency they keep is superior to the company I offer.

Thane Rosenbaum, *The Golems of Gotham* (2002). Among the people to whom he extended this "deepest gratitude" was Sam Dubbin, the lawyer and principal advocate for HSF–USA, whom Professor Rosen-

baum deemed part of his "extended family." *Id.*

Not surprisingly, after failing to disclose his close personal relationship with Mr. Dubbin and his gratitude to Mr. Dubbin for acts of generosity and kindness that he "can never repay," Professor Rosenbaum proceeded to tout precisely the same arguments that Mr. Dubbin has employed on behalf of HSF–USA. Professor Rosenbaum argued that I have "disproportionately favor[ed] the survivors in the Former Soviet Union" in my allocation decisions. Tr. at 3; *see In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 108–15 (discussing HSF–USA's objection to my allocation decisions, wherein it claimed that survivors in the Former Soviet Union (FSU) were receiving a disproportionately large share). He then argued that my allocation decision was wrong because it was without regard to the "proportionate numbers" of survivors in the FSU. Tr. at 3; *see In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 95 (explaining that HSF–USA seeks a distribution based on the proportionate numbers of the world survivor population that a given country's survivor community represents). Next, he argued that it would be fair for survivors in the United States to receive a greater share of funds "because it's their money." Tr. at 5; *see In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 109 (explaining that, despite the claims of HSF–USA, there is no "U.S. Survivors' share"). Of course, there was nothing inappropriate about such a presentation. It was inappropriate, however, for Professor Rosenbaum to make such a presentation under the guise of independence as an amicus curiae of sorts without revealing the nature of his relationship with Mr. Dubbin, HSF–USA's attorney and principal advocate. Mr. Dubbin likewise remained silent on this score.

Although I responded to Professor Rosenbaum's substantive claims on the record at the hearing and elsewhere, I turn principally to his more personal claim—that by appearing at the April 29, 2004 hearing, he sought to restore "dignity to this restitution process" and "speak on behalf of the dead." Tr. at 2. Professor Rosenbaum has a skewed perception of what it means to restore dignity to the restitution process. With his appearance at the hearing, Professor Rosenbaum did two things relevant to this class action: First, he promoted a campaign of misinformation. Second, he suggested that Jews who spent the Holocaust in the FSU are not survivors of the Holocaust worthy of restitution.

Professor Rosenbaum claimed that survivors in the FSU "will ultimately receive a greater amount of the settlement proceeds. Regardless of their proportionate numbers, regardless of the needs of the Holocaust survivors who lived elsewhere in the world and regardless of where there is a direct connection between the origins of these looted assets and the property lost by the survivors of the Former Soviet Union during the war." Tr. at 3. As I explained at the hearing and in my memorandum and order of March 9, 2004, the word "regardless," is incorrect. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89 (E.D.N.Y.2004). To the extent that survivors in the FSU have thus far received a large share of proceeds from the Looted Assets Class distributions in this case, it is precisely *because* of the proportionate number of needy survivors living there, *because* of comparative needs of survivors elsewhere, and *because* of the virtual impossibility of isolating a direct connection between any one individual's looted assets and the proceeds of this case. I will not reproduce that discussion here.

More troubling, and more in need of comment, was Professor Rosenbaum's suggestion—purportedly made "on behalf of the dead"—that survivors in the FSU are not true survivors. He explained that: "Holocaust survivors, those who witnessed the Nazi horrors, those who survived the concentration camps, automatically obtained a privileged position whenever it comes to matters pertaining to Nazi genocide." Tr. at 7. But he described Jews in the FSU in a markedly different tone:

There is no question that those people who fled Eastern Europe and avoided the camps all together found themselves caught on the wrong side of the iron curtain. They left behind a great deal of people and possession they could never reclaim. And after the war, they suffered enormously under communism and they have continued to suffer economically in the ravaged evolution of the post-Soviet society.

But the cruelties and deprivations of communism are legally and morally not the subject of these restitution proceedings. **And frankly, while it is true that many of these Russians experienced terrible hardships after the Holocaust, they were fortunate to be in the Soviet Union during the Holocaust.**

Tr. at 8–9 (emphasis added). Comments like this strip this process of dignity, not the opposite.

As Joshua Rubenstein, a regional director for Amnesty International USA and a Professor of Russian Studies at Harvard University has written:

The history of the Holocaust on Soviet territory has never been adequately understood in America. Many have heard of Babi Yar, where more than 30,000 Jews were killed in September 1941 in a two-day spree of machine-gun fire. Few realize that Babi Yar was repeated hun-

dreds of times throughout the Soviet territory. Counting only the Soviet Union as it was on the eve of the Nazi–Soviet pact, within its borders of 1939, as many as 1 million Jews were killed. Adding the territory that was annexed to the Soviet Union as a result of the Stalin–Hitler pact—the Baltic states, western Ukraine, eastern Poland—as many as 2 million more Jews are added to that total. In all, between one-third and one-half of all the Jews killed in the Holocaust were killed on Soviet or Soviet occupied territory. In human terms, the Holocaust was a defining experience in Soviet Jewish Life.

Joshua Rubenstein, *Some Were Poets, All Were Martyrs: The 50th Anniversary of Stalin's Murderous Assault on Jewish Culture, Forward,* August 9, 2002, at 12; *see also The Holocaust Encyclopedia* 139–41, 145, 591–93 (Walter Laqueur ed.2001). Was Professor Rosenbaum speaking on behalf of these dead when he discussed the "good fortune" of those who survived the slaughter of their friends, family and *landsleite* in the FSU and who are now living in abject poverty?

In any event, membership in the Looted Assets Class is based on whether an individual had property looted by the Nazis and laundered through Swiss banks, not the degree of suffering that an individual experienced during the Holocaust. Professor Rosenbaum's presentation was, therefore, legally irrelevant and reflects either his lack of familiarity with or his disregard for the terms of the settlement agreement in this case. I have previously explained at great length why Holocaust survivors living in the FSU are survivors worthy of membership in the Looted Assets Class. Indeed, in my memorandum and order dated March 9, 2004, I outlined the contrary argument, first made by Leo Rechter of HSF–USA, which Professor Rosenbaum now repeats:

[C]omparing different populations of survivors is by definition an odious process. Some of the groups that claim to be members of HSF–USA have made the process no easier by repeatedly suggesting that the survivors living in the FSU (or by the same logic, former FSU survivors who have immigrated to Israel and the United States) are not "true survivors." For example, Leo Rechter, one of the founding members of HSF–USA and now its Secretary, wrote:

> Most Jews currently residing in the FSU never saw a Nazi uniform. As you know, by the time the Nazis invaded Russia, they used 'Einsatzgruppen' to kill most of the unfortunate Jews they captured. In the communist FSU, most of those that fled eastward were able to take their most precious belongings along and did not own the real-estate they left behind. The destitute elderly Jews in the FSU are victims of the ravages of WWII (like many non-Jews in the civilian population) and of the failed communist economic system and they ought to get as much charitable assistance as possible. But by no stretch of the imagination can they be considered to be legitimate members of the 'Looted Assets' Class or any other Class.

*In re Holocaust Victim Assets Litig.,* 302 F.Supp.2d at 112 (citation omitted). In responding to this argument, I wrote:

I have already refuted this claim by providing Mr. Rechter with a study, entitled "Plunder of Jewish Property in the Nazi Occupied Areas of the Soviet Union," by Yitzhak Arad, a researcher on the Holocaust for the International Center for Holocaust Studies at Yad Vashem. *See* Letter from Judge Korman to Leo Rechter, dated September 23, 2002 (enclosing study, available at 29

Yad Vashem Studies 109–48 (2001)). Indeed, in proposing his recommendations for the Looted Assets Class, the Special Master explained in considerable detail that as was "true for Nazi victims across Europe, Jews in the former Soviet Union who lived in, owned property in, or fled from areas under Nazi occupation lost virtually all of their material possessions to the Third Reich's plunder, which in Eastern Europe was led by the notorious Einsatzgruppen, often assisted by the local population." Plan of Allocation, at 123. The "Looted Assets Class" annex to the Plan of Allocation (Annex G) made it clear that "Nazi victims' assets, and particularly those of Jews, were plundered with abandon and without precedent across all nations, all economic classes, and without regard to the ultimate fate of the victim—whether that victim was murdered in an extermination camp or work camp, or fled abroad to the East." Plan of Allocation, Annex G, at 3.

*Id.*

Nevertheless, Professor Rosenbaum contends now that those survivors in the FSU were "fortunate" during the Holocaust and should therefore not be entitled to the same "privileged position" as other Holocaust survivors. Tr. at 7. Professor Rosenbaum's comments echo the sentiments of Leo Rechter and undoubtedly reflect the belief of other HSF–USA member organizations. Indeed, Mr. Dubbin has only grudgingly accepted the conclusion that survivors in the FSU can be considered survivors for distribution purposes. In an earlier submission in this case on behalf of HSF–USA, he wrote:

> The HSF Survivors assume for purpose of this Objection the correctness of the Special Master's conclusion that the Victims of Nazi Persecution in the Former Soviet Union [are] qualified members of

the Looted Assets Class. *See, e.g.*, Special Master's Report at 23–6, and Annex G, at G–6 and G–7. The Court understands that differences of opinion exist on this question, but that they are not discussed in this request.

*In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 113 (citing Objections of U.S. Survivor Groups to Special Master's Recommendations Concerning Allocation of Accumulated Interest on Settlement Funds, filed September 27, 2002, at 11 n. 11). As I have observed, "Mr. Dubbin's hesitation in acknowledging that survivors in the FSU are true survivors is . . . inconsistent with his current position and raises serious questions regarding the claim of HSF–USA that it represents all needy survivors in the United States." *In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 113.

By purporting to appear in this case as an amicus curiae speaking "on behalf of the dead" instead of on behalf of HSF–USA, Professor Rosenbaum was free to make the argument that Mr. Dubbin was constrained from fully articulating as part of HSF–USA's presentation—that those who survived the Holocaust in the FSU were not really survivors. But Professor Rosenbaum's argument is internally inconsistent. While Professor Rosenbaum denies equal "survivor" status to victims of Nazi persecution in the FSU, he, like HSF–USA, has no qualms when it comes to using these victims to shore up his claim for a greater allocation of monies from the settlement fund to survivors in the United States. Mr. Dubbin has repeatedly relied on studies that conclude that some 25% of Holocaust survivors in the United States live below the poverty line. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 106–08, 113. So too has Professor Rosenbaum. *See* Thane Rosenbaum, *Whose Money Is It?* The Jewish Week,

May 6, 2004 (adapting his remarks from the April 29, 2004 hearing and remaining silent on his personal relationship with Mr. Dubbin). These studies include survivors who spent the Holocaust in the FSU and have relatively recently immigrated to America, and it is these survivors who overwhelmingly reflect the greatest level of need in the United States. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 113. Indeed, "the fact of being a recent immigrant from the FSU is the best predictor of poverty for survivors in the United States." *Id.* Professor Rosenbaum is apparently willing to count such survivors when asserting a claim for funds if not when deciding who should receive the funds.

As I have said before, "[a]ll individuals who survived the Holocaust bear scars, and all merit relief." *In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 97. We should not be engaged in comparing degrees of suffering among Holocaust survivors, particularly since the definition of victim of Nazi persecution in the Settlement Agreement is not predicated on such matters. *See* Settlement Agreement, Section 1, Definitions. A victim of Nazi persecution includes *any* individual "persecuted or targeted for persecution by the Nazi Regime because they were or were believed to be Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped." *Id.*