**In re MATZO FOOD PRODUCTS LITIGATION.**

Civ. A. No. 90–1146.

United States District Court, D. New Jersey.

Aug. 3, 1994.

Chimicles, Jacobsen & Tikellis by Kenneth A. Jacobsen, Haverford, PA, Kohn, Nast & Graf, P.C., Philadelphia, PA by Dianne M. Nast, Philadelphia, PA, Larry D. Drury, Ltd. Chicago, IL by Larry D. Drury, Chicago, IL, Morgan, Hallgren, Crosswell & Kane by William E. Haggerty, Lancaster, PA, Kiernan & Strenk by Charles A. Strenk, Morristown, NJ, for plaintiffs and the Class.

Gold & Wachtel by William Wachtel, New York City, for defendants.

Blank, Rome, Comisky & McCauley by Stephen M. Orlofsky, Cherry Hill, NJ, for Francis J. Sullivan, Trustee in the Bankruptcy of Samuel Zukerman & Co.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This is a price-fixing antitrust action involving the sale of matzo and matzo products. Before me now is plaintiffs' motion for final approval of the proposed settlement of this action pursuant to Rule 23 of the Federal Rules of Civil Procedure and their application for an award of attorneys' fees, costs, and incentive payments to the class representatives.

I. Factual and Procedural Background

On March 19, 1990, a federal grand jury indicted B. Manischewitz Co. ("Manischewitz") for violations of the Sherman Act, 15 U.S.C. § 1. The indictment charged that Manischewitz, together with unnamed co-conspirators, conspired to fix the price of matzo and matzo products sold as Kosher for Passover between 1981 and 1986.[1] Within the week, plaintiffs Whitemarsh Shop N' Bag, Inc. ("Whitemarsh"), The Fresh Spot, Inc. ("Fresh Spot"), and Barbara Rosen t/a Mr. Deli and Mrs. Deli Too ("Rosen") filed

1. On April 26, 1991, Manischewitz entered a plea of *nolo contendere* to the indictment, which was accepted by this court. Manischewitz was sentenced in May 1991 to pay a $1 million fine, the maximum penalty sought by the government.

private antitrust class actions against Manischewitz. On April 26, 1990, The Milk Pail, Inc. ("Milk Pail") filed an action against Manischewitz and B. Manischewitz Sales Corporation ("BMSC"), a wholly-owned subsidiary of Manischewitz, in the Northern District of Illinois. The Illinois action was transferred to the District of New Jersey where it was consolidated with the other three actions. A civil antitrust action was also filed against Manischewitz in California state court on behalf of a class of California consumers of Passover matzo products.

On June 29, 1990, plaintiffs Whitemarsh, Fresh Spot and Milk Pail filed the First Consolidated Amended Complaint ("Amended Complaint") against Manischewitz and BMSC on behalf of a class of all purchasers of Passover matzo products from the defendants between January 1, 1981 and April 30, 1986. Plaintiffs alleged that during that period, defendants sold approximately $25 million worth of Passover matzo products at prices that they and unnamed co-conspirators unlawfully fixed, causing damages to plaintiffs and the class members. In order to recover for antitrust injuries dating back to 1981, plaintiffs also alleged that defendants fraudulently concealed the price-fixing conspiracy, thereby tolling the four-year statute of limitations, 15 U.S.C. § 15b.

In July, 1990, defendants moved to dismiss the Amended Complaint pursuant to Rule 9(b) of the Federal Rules of Civil Procedure on the ground that plaintiffs failed to adequately plead fraudulent concealment. On October 22, 1990, I granted defendants' motion and gave plaintiffs 15 days to amend the Amended Complaint or suffer dismissal.

Plaintiffs thereafter entered into settlement discussions with defendants, which ultimately resulted in a proposed settlement. As initially defined, the settlement class was to be comprised of all purchasers of Kosher for Passover matzo products from Manischewitz and BMSC between January 1, 1981 and April 30, 1986. The settlement was presented to this court for preliminary approval, and on January 8, 1992, I preliminarily approved the proposed settlement and authorized plaintiffs to send notice to all class members. At that point, the parties realized that there had been a misunderstanding about the scope of the settlement class. The parties informed the court that they needed to renegotiate and redraft the settlement agreement and were therefore unable to send out notice as directed by the court.

The parties eventually negotiated a second proposed settlement agreement ("Settlement Agreement" or "Agreement"), which was presented to the court in November 1992. The settlement class definition was modified to clarify that the settlement applied only to distributors who purchased directly from Manischewitz in the United States and not to retailers who purchased from BMSC or any other entity ("Settlement Class").[2]

The Settlement Agreement provides for the creation of a Food Product Fund consisting of matzo products with a value of $1,800,000. This fund is to be distributed over a four-year period to charitable organizations qualifying as such under 26 U.S.C. § 501(c)(3). The valuation of the Food Product Fund is based on the prices paid by customers of BMSC to BMSC for Passover matzo products. According to class counsel, this valuation reflects the negotiated compromise between defendants (who wanted the products to be valued at the higher prices paid by consumers to retailers) and plaintiffs (who wanted the products to be valued at the lower prices paid by distributors to Manischewitz). In their brief, class counsel also represented to the court that the price paid to BMSC is approximately two times greater than Manischewitz's cost of manufacture.

The proposed Settlement Agreement also provides for the creation of a cash fund of $450,000 from which payments are to be made, subject to court approval, for attorneys' fees and costs of litigation, including expenses for notice, and special payments to the class representatives. Finally, the Agreement provides for a second cash fund

---

**2.** The Settlement Agreement defines the settlement class as follows:

All persons, corporations and entities in the United States (excluding the Defendants, their subsidiaries, and affiliates) who purchased Kosher for Passover matzo products directly from Manischewitz during the period January 1, 1981 through April 30, 1986.

of $50,000 which is to be held in escrow for two years after the final approval date, to be used to defray defendants' legal fees and costs in the event a subsequent action is brought by a retailer who purchased matzo products directly from BMSC and who therefore would not be included in the Settlement Class. Any amount left in the $50,000 fund at the end of the two-year period is to be distributed to counsel as additional fees.

The Settlement Agreement contains no provision for any distribution, either direct or indirect, to the members of the Settlement Class. Instead, the Agreement provides that the members of the Settlement Class have determined not to participate in the settlement and waive their right to any distribution under the Agreement. Any class member who does not opt-out will be bound by the judgment.

According to class counsel, they agreed to the creation of a Food Product Fund to be distributed to charity, rather than a cash fund to be distributed to members of the Settlement Class,

> based upon their understanding that the Settlement Class members had no interest in participating in a cash distribution and that they would opt out of the Class if Plaintiffs continued to prosecute the case. Defendants' counsel repeatedly represented to Plaintiffs' counsel that the members of the Settlement Class maintained a close relationship with Defendants and thus would not want to participate personally in any settlement distribution or judgment against Defendants.

Plaintiffs' Brief at 13; Declaration of Kenneth A. Jacobsen, at ¶ 17(f); *see also* Plaintiffs' Brief at 27 (noting disinterest on part of class members). On January 6, 1993, I issued an order certifying the Settlement Class for purposes of settlement and again directing that notice be sent to class members. Notice was mailed on January 15, 1993 to 112 purchasers of matzo from Manischewitz. One member of the plaintiff class, Francis J. Sullivan, Trustee in the Bankruptcy of Samu-

el Zukerman & Company ("Zukerman"), objected to the proposed Settlement Agreement and to class counsel's fee application. The objector essentially opposed the Agreement on the ground that it conferred no benefit whatsoever, either direct or indirect, onto the class members. The objector also raised the concern that class counsel represented to the court that no class member wished to participate in any recovery against Manischewitz, when, in fact, Zukerman wished to pursue its claim against Manischewitz. Zukerman therefore contended that plaintiffs' counsel did not adequately represent the interests of the class members.

On March 8, 1993, I held a hearing on plaintiffs' motion for approval of the Settlement Agreement. During the hearing, I informed class counsel of my concern that the class members were not receiving any recovery under the terms of the proposed Settlement Agreement.[3] I also conveyed my dissatisfaction with the submissions of class counsel. Specifically, I found that class counsel had not adequately established a factual record in support of the terms of the proposed Agreement. I therefore reserved judgment on the motion and directed class counsel to supplement their submissions.

Class counsel thereafter submitted a revised memorandum of law in support of the Settlement Agreement, as well as two declarations from class counsel. After the revised submissions were submitted, but before the second hearing was held, the parties managed to resolve the objection of the objecting class member. The parties and the Trustee for Zukerman executed a supplement to the Settlement Agreement ("Supplement"), subject to the approval of the court, pursuant to which the Trustee will receive $35,000 from the Cash Fund and $40,000 from the defendants, for a total of $75,000. The objector in turn will opt-out of the Settlement Class and withdraw its objection.

The second hearing on the Settlement Agreement was held on July 28, 1994. Upon questioning, I ascertained that the price at

---

**3.** Following the hearing, counsel for the class and for defendants apparently discussed the possibility of restructuring the Settlement Agreement to permit class members to receive a distri-

bution from the Food Product Fund. Class counsel has represented, however, that Manischewitz was unwilling to modify the terms of the Settlement Agreement.

which the Food Product Fund is valued is, in fact, approximately three times greater that Manischewitz's cost of manufacture, rather than two times greater as was originally represented to the court. Therefore, Manischewitz's cost to manufacture $1.8 million worth of matzo is only about $600,000. I further ascertained from Manischewitz's counsel that Manischewitz has already distributed matzo products worth at least $1.8 million to various charities. In short, Manischewitz has proceeded as if the Agreement were in effect, despite the fact that the court has not yet approved the Settlement Agreement. Thus, as a purely practical matter, the only outstanding issue, assuming I were to approve the Agreement, is that of the attorneys' fees and costs. In this regard, class counsel has represented that as of the date of the second hearing, the combined lodestar figure for all class counsel amounts to $510,222.00.[4]

## II. Discussion

### A. Standard

■ "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). The court has a "fiduciary responsibility, as the guardian of the rights of the absentee class members" when deciding whether to approve a settlement agreement. *Id.* at 157; *see* 2 *Newberg on Class Actions*, § 11.41 at 11–93 (3d ed. 1992) (hereinafter Newberg) ("In all class settlements, and especially in those involving both monetary and nonmonetary relief, the court has the duty to determine whether the settlement properly safeguards the interests of absent class members.").

■ In order to approve a proposed settlement, the court must be satisfied that the agreement is "fair, adequate, and reasonable," and not the product of fraud or collusion. *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118 (3d Cir.1990); *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983); *Greenfield v. Villager*

*Industries, Inc.*, 483 F.2d 824, 833 (3d Cir. 1973). To make this determination, the factual record before the district court must be sufficiently developed. *Girsh*, 521 F.2d at 159. The court cannot simply give "rubber stamp approval" of the settlement, Newberg, *supra*, § 11.41 at 11–88, nor rely "on the arguments and recommendations of counsel." *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir.1982). "Rather, to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished." Newberg, *supra*, at 11–88–89. Finally, where, as here, settlement negotiations and the proposed settlement occur prior to class action certification and court designation of a class representative, "the court must be doubly careful in evaluating the fairness of the settlement to plaintiff's class." *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971); *accord Plummer*, 668 F.2d at 657–58.

■ The Third Circuit has delineated the following factors that are relevant to the determination of whether a settlement agreement is fair, adequate and reasonable:

1) The complexity, expense and likely duration of the litigation;

2) The reaction of the class members to the settlement;

3) The stage of the proceedings and the amount of discovery completed;

4) The risks of establishing liability;

5) The risks of establishing damages;

6) The risks of maintaining the class action through the trial;

7) The ability of the defendants to withstand a greater judgment;

8) The range of reasonableness of the settlement fund in light of the best possible recovery;

9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

---

4. This amount, of course, exceeds the $450,000 amount allotted under the terms of the Settle-

ment Agreement for fees, costs, and incentive payments to the class representatives.

*Girsh,* 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)); *see also Stoetzner,* 897 F.2d at 118. The burden of proving the fairness of the proposed settlement is on the proponents. *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); Newberg, *supra,* § 11.42, at 11–94.

## B. Analysis

■ I have very carefully considered the submissions and oral arguments of counsel, the terms of the proposed Settlement Agreement, and the circumstances of this case, and I have concluded that I cannot approve the Settlement Agreement. Indeed, this action provides a good example of the way in which the class action device is subject to abuse.

Class counsel concede in their brief that the proposed settlement is highly unusual, and indeed it is. The reason it is unusual, however, is not simply because the class members are not receiving any direct monetary benefit under the terms of the Settlement Agreement, nor because charitable organizations are the direct beneficiaries under the Settlement Agreement. Such settlements are, in fact, routinely approved by courts.

■ As class counsel correctly point out, a number of cases have applied what is known as the *cy pres* doctrine, which originated in the field of charitable trusts, in the class action context. The *cy pres* doctrine is a rule of construction used by courts to effectuate testamentary charitable gifts where it is impossible to carry out the specific intent of the testator. *See* Newberg, *supra,* § 10.17 at 10–41 (citation omitted); *Pray v. Lockheed Aircraft Corp.,* 644 F.Supp. 1289, 1303 (D.D.C.1986). Under the doctrine, the court attempts to put the testamentary gift to its "next best use" in order to effectuate as closely as possible the testator's intent. *See* Newberg, *supra,* § 10.17 at 10–41.

In the class action context, courts have employed *cy pres* principles to distribute class damages or settlement funds for the indirect benefit of the class where actual distribution to class members is not feasible. *Id.* at 10–40–41. Generally, the funds are paid to a third party such as a charitable organization or agency for use for designated purposes. *Id.* at 10–41–42.

*Cy pres* principles have most commonly been used where unclaimed funds remain following distribution of the class fund to individual class members. In such circumstances, the court, analogizing to *cy pres* principles, may distribute the unclaimed portion for the indirect benefit of the class.[5] Newberg, *supra,* § 10.16 at 10–39; *see, e.g., Nelson v. Greater Gadsden Housing Authority,* 802 F.2d 405, 409 (11th Cir.1986) (in action involving utility allowances to tenants in public housing complex, court approved use of unclaimed compensatory damages to increase the energy efficiency of the apartment units or to improve the defendant-supplied appliances within the units); *Powell,* 843 F.Supp. at 499–500 (in race discrimination suit, court approved distribution of residual settlement funds to nonprofit foundation for purpose of administering scholarship program for African–Americans); *see generally Superior Beverage Co. v. Owens–Illinois, Inc.,* 827 F.Supp. 477, 478–79 (N.D.Ill. 1993) (discussing *cy pres* doctrine and cases that have applied doctrine to funds unclaimed by individual class members).

*Cy pres* principles have also been utilized where the class recovery cannot feasibly be distributed to the individual class members. Newberg, *supra,* § 10.17, at 10–40–41. Typically, the court employs *cy pres* where class members cannot be located or where individual recoveries would be so small as to make distribution economically impossible. For example, in the consumer class action filed against Manischewitz in California state court, the court approved a settlement pursuant to which a $500,000 Food Fund was distributed to needy California consumers by

---

**5.** The district court generally has four alternative procedures for distributing unclaimed class damages or class settlement funds: 1) *cy pres* distribution; 2) escheat to the government; 3) reversion to the defendants; and 4) claimant fund-

sharing. *See Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1307–09 (9th Cir.1990); *Powell v. Georgia–Pacific Corp.,* 843 F.Supp. 491, 495–97 (W.D.Ark.1994).

the B'Nai B'Rith organization. The court did so based on an express finding that this was the only reasonable method of distribution because each class member's recovery would be, on the average, less than $1.00, and the cost of a direct refund would exceed $1.00 per class member. *In re Kosher Food Products Antitrust Litigation,* JCCP No. 2518 (Cal.Sup.Ct. November 22, 1991); *see also In re Agent Orange Product Liability Litigation,* 818 F.2d 179, 184–85 (2d Cir.1987) (court approved use of portion of settlement fund to fund assistance programs for the class as a whole where distribution to individuals not feasible); *State of New York v. Keds Corp.,* 1994–1 Trade Cases ¶ 70,549, 1994 WL 97201 (S.D.N.Y.1994) (in price-fixing antitrust case, court approved distribution of $5.7 million to charities where alleged overcharges were in the range of $1.00 to $1.25 per pair of shoes, over five million pairs were sold, it would be difficult if not impossible to trace individual consumers, and cost of locating consumers would eliminate any economic benefit of settlement).

The situation before this court is altogether different. Plaintiffs here do not claim that a *cy pres* settlement is appropriate because it would be impossible or difficult to locate class members, or because each individual class member's recovery would be so small as to make an individual distribution economically impossible. The class members consist of 112 known distributors of Manischewitz's products. Nor does class counsel argue that the distributors' individual recoveries would be so small as to make individual distribution economically impractical. In this regard, the court notes that the sole objector to the settlement, Zukerman, settled its claim against Manischewitz for $75,000. Nor is this a situation where funds have been distributed to the individual class members and there are some funds leftover.

Plaintiffs claim that a *cy pres* settlement is appropriate in this case because the class members do not wish to participate in any recovery or judgment against the defendants. Indeed, class counsel go so far as to represent that were the case to proceed to trial, the class members would choose not to pursue the litigation and would opt out of the action. *See* Plaintiffs' Brief at 13. In other words, class counsel have pursued this litigation, and have created this settlement, on behalf of class members who apparently do not wish to have anything to do with the litigation. In short, class counsel are litigating this case without any clients. Counsel have not cited, and this court has not uncovered, any case which would support use of *cy pres* principles under such circumstances.

Class counsel's attempt to analogize this case to cases where there are left-over funds following a distribution is unpersuasive. The majority of class actions result in some unclaimed funds following distribution to individual class members. *Arizona Citrus,* 904 F.2d at 1306 (citing 2 *Newberg on Class Actions,* § 10.14 (2d ed. 1985)). As a result, courts must—as a practical matter—decide what to do with the remaining funds. *Cy pres,* under certain circumstances, may provide the solution. *See Arizona Citrus,* 904 F.2d at 1307–09; *Powell,* 843 F.Supp. at 495–97. This is a far cry from the present situation. The court here is not confronted with the practical problem of disposing of left-over funds. Indeed, the class members are not given the opportunity to make a claim against the settlement fund under the terms of the proposed Agreement. The court is faced with a situation where the entire settlement is predicated on *cy pres* principles because the actual parties in interest purportedly do not wish to pursue their claims against the defendants. If it is true that the class members do not want to participate in any recovery, then this is a case where the fund never should have been created in the first place. Indeed, it appears that the proposed settlement is simply a thinly disguised ploy for the recovery of nearly $500,000 in attorneys' fees. Under these circumstances, I simply cannot conclude that the settlement, under which the class members recover nothing, is fair, adequate and reasonable.

 Class counsel argue, however, that a *cy pres* settlement is appropriate because of its punitive or deterrent impact on the defendants. They contend that a settlement based on a claims-made basis with a reversion to defendants would have no deterrent effect on the defendants due to the class members'

lack of interest in the settlement. However, a settlement, quite obviously, cannot be approved based solely on the fact that it has punitive or deterrent impact on the defendants. The court's primary consideration must be the interests of the absent class members and the fairness, adequacy and reasonableness of the settlement. *See Girsh*, 521 F.2d at 157. In any event, as discussed above, a criminal indictment was brought against Manischewitz, and a $1 million fee was imposed. Thus, Manischewitz has already been "punished" for its allegedly wrongful conduct.

■■■ Finally, class counsel argue that a *cy pres* settlement pursuant to which matzo is distributed to charities is appropriate because the consumers are the parties ultimately injured by antitrust violations, rather than the distributors. There is no question, however, that were the case to proceed to trial and liability proven, the distributors would be entitled to recover monetary damages. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (direct purchaser is entitled to recover full amount of overcharge even if the overcharge was "passed on" to consumers). Thus, plaintiffs' rationale for approval of a settlement pursuant to which the class members themselves receive nothing is simply inadequate. Furthermore, a settlement which confers all the benefit to the ultimate consumers would appear to contradict *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which held that consumers, as "indirect purchasers," cannot recover damages for illegal overcharges. *See also Kansas v. Utilicorp United Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).[6]

There is another aspect to the proposed settlement which is particularly disturbing. As noted above, the court has a fiduciary responsibility to protect the rights of absentee class members when deciding whether to approve a settlement agreement. *Girsh*, 521 F.2d at 157. Class counsel's representation to this court as to the class members' level of interest in the litigation is based on defense counsel's representations. *See* Plaintiffs' Brief at 13 ("Defendants' counsel repeatedly represented to Plaintiffs' counsel that the members of the Settlement Class maintained a close relationship with Defendants and thus would not want to participate personally in any settlement distribution or judgment against Defendants.") These representations, in turn, are based on Manischewitz's communications with the class members. *See id.* at 14 ("To confirm these representations, counsel for Plaintiffs discussed with defense counsel their expectation that Manischewitz would communicate with members of the putative Settlement Class to ascertain their views and ensure that they truly had no interest in participating.") According to class counsel, such communications were appropriate because Manischewitz has a continuing relationship with the class members. *Id.*

6. Even were this case otherwise appropriate for application of *cy pres* principles, I find that the terms of the Settlement Agreement do not effectuate the purpose of the *cy pres* doctrine. As noted above, the purpose of *cy pres* is to put the funds to their "next best use." Newberg, *supra*, § 10.17 at 10–41. Thus, a *cy pres* settlement may be rejected where it fails to provide the next best distribution. *Arizona Citrus*, 904 F.2d at 1308. In *Arizona Citrus*, the Ninth Circuit set aside the district court's *cy pres* application because the proposed distribution did not adequately target the plaintiff class. The action had been brought under the Farm Labor Contractor Registration Act on behalf of a class consisting of undocumented Mexican workers employed by the defendant during the 1976–77 picking season. Following a bench trial, the district court issued a judgment for statutory damages and ordered that any unclaimed funds be distributed through a cy pres award to the Inter–American Fund for indirect distribution in Mexico. The court of appeals held that even though the district court's proposal permitted distribution to areas where the class members may live, there was no reasonable certainty that any member would be benefitted. *Id.* at 1308. The court therefore rejected the proposal because it would benefit a group far too remote from the plaintiff class. *Id.* Similarly, the proposed settlement in this case does not sufficiently target the plaintiff class. *See also Shults v. Champion Int'l Corp.*, 821 F.Supp. 520, 524 (E.D.Tenn.1993) (rejecting proposed settlement that created charitable fund for benefit of community in part because settlement did not confer direct benefit to class members). *But see Superior Beverage*, 827 F.Supp. at 478–79 (observing that *cy pres* doctrine has become more flexible in recent years).

I disagree. Such communications between adversaries strike the court as questionable, at best. As one commentator has noted, unique problems arise where there is a close business relationship between class members and the defendant, such as exists between manufacturers and distributors. *See* Newberg, *supra,* § 8.42 at 8–131. In such cases, business customers or purchasers may be understandably reluctant to pursue their claims against the defendant "for fear that they are biting the hand that feeds them or supplies them with needed goods or materials." *Id.* This fear can only be exacerbated where it is the defendant itself who is communicating with the class members in order to ascertain their views towards the pending litigation. This court cannot ignore the threat of economic sanction or retaliation that may have been implicit in such communications. For the same reason, the court cannot accept the argument that the notice of the settlement constituted an accurate poll of the class members. The court cannot be sure that the lack of response to the notice, save for the one class member who is no longer in a continuing relationship with Manischewitz, is not the result of the communications between the class members and Manischewitz.[7]

Under the circumstances, I am unable to conclude that the settlement is fair, reasonable and adequate. I therefore cannot approve the Settlement Agreement proposed by class counsel and the defendants. Plaintiffs' motion for approval of the Agreement and their application for fees, costs and incentive awards are accordingly denied.

### Conclusion

For the foregoing reasons, plaintiffs' motion for approval of the proposed Settlement Agreement and their application for attorneys' fees, costs and incentive awards are both denied.

---

**7.** Class counsel assert that because none of the named plaintiffs were distributors, it might appear that class counsel were soliciting a distributor to serve as a plaintiff if class counsel were to communicate with the distributors. This court, however, is confident that class counsel could have communicated with the class members without conveying such an impression. Such communications would have been preferable to communications between Manischewitz and the class members.