In re HOLOCAUST VICTIM
ASSETS LITIGATION.

Nos. CV–96–4849(ERK)(MDG),
CV–99–5161, CV–97–461.

United States District Court,
E.D. New York.

April 21, 2004.

Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Morris A. Ratner, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, NY, one of plaintiffs' class counsel.

Sid Wolinsky, Oakland, CA, for the Disability Rights Advocates.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM

KORMAN, Chief Judge.

I write here to address a motion by Disability Rights Advocates (DRA) for reconsideration of an order entered on April 2, 2004 in connection with the distribution of proceeds of the Settlement Fund in this case, the background of which is set forth at *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d 139 (E.D.N.Y.2000), *In re Holocaust Victim Assets Litigation,* 302 F.Supp.2d 89 (E.D.N.Y.2004), and *In re Holocaust Victim Assets Litigation,* 2004 WL 717243, 2004 U.S. Dist. LEXIS 5432 (E.D.N.Y. April 2, 2004). Specifically, the issues in dispute arise in the context of deciding how to distribute money that may remain undistributed from the $800 million initially allocated to the Deposited Assets Class.

On April 2, 2004, I denied DRA's proposal for a *cy pres* award from money that may remain undistributed from the sum initially allocated to the Deposited Assets Class. *See In re Holocaust Victim Assets Litig.,* 2004 WL 717243, 2004 U.S. Dist. LEXIS 5432. DRA had requested that 2–3% of any residual funds be devoted to a "[t]rust that will provide grants to disability oriented, non-profit, non-governmental organizations" with a goal of "advanc[ing] the human rights of people with disabilities" irrespective of those organizations' connection to the Holocaust. *See* Proposal for *Cy Pres* Award For the Class of "People who are Physically or Mentally Disabled or Handicapped" From the Allocation of Residual Unclaimed Funds, at 6. I held that, under the *cy pres* doctrine, the "next best" use of any residual funds was to distribute them to needy victims of Nazi persecution, almost all of whom are now disabled. *See In re Holocaust Victim Assets Litig.,* 2004 WL 717243, 2004 U.S. Dist. LEXIS 5432.

On April 12, 2004, DRA filed a motion for reconsideration, along with several objections. *See* Motion for Reconsideration and Objections, filed April 12, 2004 (hereafter "DRA Motion"). Specifically, DRA sought to renew an objection to the notice plan employed in this settlement that it had withdrawn in July 2000, and whose withdrawal DRA confirmed was intended as unconditional after I had addressed and rejected the objection on the merits. *See* Memorandum and Order, dated July 26, 2000; Letter from Sid Wolinsky to Judge Korman, dated July 31, 2000. DRA also objected to the manner in which I have distributed settlement funds thus far and the manner in which I propose to distribute any remaining funds, arguing that my decisions have provided certain "victim claimant categories—particularly Jewish class members—with a widely disproportionate and unfair financial benefit as compared to groups serving members with disabilities." DRA Motion, at 19. Because I did not want to delay any appeal, I rejected the DRA's motion for reconsideration and its objections the same day I received them. *See* Order, dated April 12, 2004. I stated that in an opinion to follow shortly, I would "discuss fully the background of the DRA's actions in this case as well as its frivolous claims." *Id.* I now provide that opinion.

From the beginning, DRA's filings in this case have been of questionable propriety. As I will explain, DRA first appeared in this case on October 21, 1999 by filing a "conditional objection" to the notice to disabled survivors along with a request for a separate *cy pres* distribution that would benefit organizations serving the disability community irrespective of their relationship to the Holocaust. *See* Conditional Objection by People with Disabilities—Defective Notice for Disabled Class Members, filed October 21, 1999 (hereafter, "Conditional Objection"). When considered in light of DRA's contemporaneous request for substantial attorneys' fees, the lateness of the hour in which it filed its "conditional" notice objection, and DRA's threat to delay the settlement process by appealing any adverse ruling, this "conditional objection" suggested to me that DRA was more concerned with procuring for itself some pecuniary reward than correcting any alleged deficiencies in notice to the disabled. While this series of filings was offensive, its latest filing crosses the line.

## I.  Notice to Disabled Plaintiffs

In light of its centrality to all of the issues discussed here, I begin with DRA's attempt to "renew its objections to the notice with respect to the claimant category of 'people who are physically or mentally disabled or handicapped.'" DRA Motion, at 1. DRA claims that "[t]he notice issue is significant, not only as a due process and jurisdictional defect, but because it sets the stage for a situation in which a *cy pres* remedy is required—where potential beneficiaries of a settlement have not or cannot effectively be reached." *Id.* at 3. But if the notice to the class of the settlement was sufficiently deficient to create a "due process and jurisdictional defect," that defect could never have been compromised in the manner DRA proposed in its original objection. Nor could it have been cured by adopting the plan of allocation submitted by DRA for the benefit of persons who were not members of the class. Indeed, DRA's willingness to acquiesce in the withdrawal of an objection—an objection where it claimed the notice plan deprived members of the class of due process to which the Constitution entitles them— sheds significant light on the underlying motivation for its conduct. Ultimately, the "due process and jurisdictional defect" that DRA postulated was nothing more than a weapon to be used to obtain a benefit to itself and other strangers to the class.

The objection, which I have addressed on the merits once before, is frivolous. First, some background is needed.

In my judgment approving the Settlement Agreement in this case, I described the notice plan as follows:

> The notice plan, which I approved in an order dated May 10, 1999, was tailored to the unique circumstances of this case; was effective as implemented, as discussed below, in that it provided the best notice practicable under the circumstances in terms of content, format and dissemination; and satisfied due process requirements and Fed.R.Civ.P. 23(c). There is no list of all the members of the settlement classes that would have permitted the notice administrators to send notice exclusively by direct mail to all settlement class members. Instead, I directed settlement class counsel, through four notice administrators, to implement the multi-faceted notice plan, involving, in addition to direct mail utilizing existing lists covering segments of the settlement classes, worldwide publication, public relations (i.e., "earned media"), Internet and grass roots community outreach.
>
> Each of the court-appointed notice administrators oversaw distinct aspects of the notice plan, and their various reports filed with the court detail the exhaustive efforts undertaken to give all settlement class members an opportunity to learn of their rights, evaluate the basic terms of the proposed settlement and comment, either by submitting correspondence, e-mailing the notice administrators or returning an Initial Questionnaire.
>
> Each element of the notice plan that I approved has been successfully implemented, including the following: (i) world-wide publication, (ii) press coverage, (iii) an extensive community outreach program, (iv) a direct mail program that included the sending of more than 1.4 million notice packages directly to potential class members in at least 48 countries and (v) an Internet notice effort.

*In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 144–45. As DRA concedes, "[t]he notification process in this case was hailed as the most ambitious effort ever to notify beneficiaries of a legal settlement." DRA Motion, at 8.

Nevertheless, DRA lodged a "conditional objection" to the notice plan on October 21, 1999 claiming that there was a "patent deficiency of the notification procedures for people with disabilities." Conditional Objection, at 1. DRA did not explicitly state what the objection was conditioned upon, but it implied that the objection would disappear if I granted its request for a *cy pres* remedy. Oral argument was held on DRA's objection and various options were considered, but in the end, nothing was changed. Then, on July 5, 2000, DRA withdrew its objection. *See* Withdrawal of All Previously Asserted Objections, dated July 5, 2000 ("Disability Rights Advocates hereby formally withdraws all previously asserted objections involving any aspect of the settlement or notice relating to 'People Who Are Physically or Mentally Disabled or Handicapped.' "). Notwithstanding this withdrawal, I addressed the objection in my initial judgment approving the Settlement Agreement because a potentially meritorious objection to the adequacy of notice could not be ignored. *See National Super Spuds v. N.Y. Mercantile Exchange*, 660 F.2d 9, 16 (2d Cir.1981). Indeed, I asked Morris Ratner, one of plaintiffs' class counsel, to urge DRA to reassert its objection. Rather than analyze anew this objection and what led to my decision, I restate in full what I wrote then:

Plaintiffs' counsel have repeatedly sought advice from disability advocacy groups on how to devise a targeted notice program that would reach the few remaining survivors of the Holocaust who were persecuted 60 years ago because of a disability without expending an absurdly high proportion of the settlement fund. [Declaration of Burt Neuborne (June 26, 2000) ("Neuborne Decl. II")] ¶ 42. Disability Rights Advocates ("DRA"), a non-profit entity appearing on behalf of, although not formally representing, those members of the plaintiff classes with physical and mental disabilities (and their heirs), has criticized the notice plan, as implemented, because it did not specifically target organizations benefitting persons with disabilities.

Conspicuously, DRA waited until the virtual completion of the notice program before interposing its formal objection to the notice plan, styled a "conditional objection," which it filed on October 21, 1999. In its objection, DRA argued that, while the notice to the disabled class plaintiffs was inadequate because no attempt was made directly to target disability organizations, nevertheless, (i) given the imminence of the opt-out deadline, it was too late to amend the notice plan to correct this alleged deficiency; and, conversely, (ii) given the inadequacy of the notice plan as applied to disabled class members, it would have been fruitless to extend the opt-out period for those plaintiffs in any event. DRA did not suggest that I *combine* those two potential solutions by amending the notice plan *and* by extending the opt-out period for the disabled. Instead, argued DRA, the only feasible way to remedy the allegedly deficient notice to the disabled was by resort to the legal doctrine of *cy pres*. Under that doctrine, DRA argued, the "next best" alternative to giving targeted notice to disability organizations (which, DRA

claimed, it was too late to do), and the "only feasible way to ensure that the maximum number of these [disabled] class members benefit from the settlement funds," DRA Objection at 15, was to earmark a substantial portion of the settlement amount for direct distribution to various disability organizations. Such distributions apparently would be made without regard to whether those organizations, which presumably would include DRA, have any particular connection to disabled persons who were victims of the Holocaust. DRA also has threatened that, if the requested *cy pres* distributions are not implemented, it will delay the entire settlement process by appealing my ruling on the notice question. Neuborne Decl. II ¶ 41.

Significantly, on October 21, 1999, simultaneously with the filing of its notice objection, DRA filed a motion seeking attorneys' fees in the amount of $311,649.02 (plus $25,341.50 in costs). *See* Declaration of Sid Wolinsky (Oct. 19, 1999) Exs. M, N. While DRA had absolutely nothing to do with the inclusion of the disabled as a separate subclass, it sought fees for the time it spent (i) developing its settlement fund allocation proposal with respect to disabled members of the plaintiff classes, (ii) preparing written submissions in this litigation documenting the hardships of persons with disabilities who were victims of the Holocaust and (iii) preparing written submissions alerting me and plaintiff class counsel to the alleged inadequacies in the notice plan with respect to disabled claimants.

I heard oral argument from DRA on November 22, 1999. At argument, I noted that, even if I agreed with DRA's contention that the notice to the disabled was inadequate, it appeared that the best remedy, short of the massive, indiscriminate *cy pres* distributions that DRA

sought, would have been to employ the combined approach, alluded to above, of amending the notice plan and extending the opt-out period for disabled claimants. I did not believe that it was too late to do either of these things, given the flexibility afforded to me in this context. Moreover, even if it was too late to give additional notice to the disabled and to extend their opt-out period, such additional notice could be given at the allocation and distribution stage, which, it seemed to me, was the more critical period for the receipt of notice by disabled class members, since most did not appear to have any incentive to opt out of the settlement. As Professor Neuborne stated:

> ... I would think it inconceivable that any members of the disabled community really have a strong reason to opt out. They're not going to have individual claims that they can process by themselves effectively outside the lawsuit and there's no ideological reason why they would have wanted to opt out.... The crunch time is once the proposed plan of allocation comes out by the special master, making sure that as many people know about that plan and get a chance to comment on it, and get a chance to file claims under it.

Transcript of Oral Argument (Nov. 22, 1999) at 118. And, as noted by Elizabeth J. Cabraser, Esq., another member of class counsel, DRA fails to explain "who would want to opt out of the settlement to pursue their own individual lawsuit against the settling defendants, particularly since the disabled group has all of the rights and opportunities to maximize their recovery in this settlement process and is not taking second place to any other group." *Id.* at 84.

Regardless of whether corrected notice was to be given at the settlement approval stage or at the allocation and distribution stage, however, my underlying belief was that the appropriate remedy for allegedly deficient notice was not to order *cy pres* distributions, but rather, to correct the notice. Indeed, ordering the *cy pres* remedy advocated by DRA not only would be inappropriate, but also would be impermissible *if* the alleged defects in the notice are correctable. *See Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 345 (7th Cir.1997) ("cy pres recovery should be reserved for unusual circumstances," *inter alia,* where the individuals injured " 'cannot be given notice of the case' "); *In re Matzo Food Products Litigation,* 156 F.R.D. 600, 605 (D.N.J.1994) ("Typically, the court employs cy pres where class members cannot be located or where individual recoveries would be so small as to make distribution economically impossible"). On the other hand, as Professor Neuborne observes, if DRA is correct in suggesting that notice to the disabled is fatally defective, the appropriate remedy would not be a massive *cy pres* distribution to persons or entities having nothing to do with the facts of this case, but to remove surviving disabled Holocaust victims from the plaintiff classes altogether, since it would be unlawful to bind them to the terms of the Settlement Agreement in this case in the absence of adequate notice.

Notwithstanding these considerations, DRA's counsel continued to insist at oral argument, without factual support or other explanation, that notice to the disabled was inadequate, that it was too late to extend the opt-out period and provide additional notice, and that *cy pres* was the only remedy. Moreover, when I specifically asked them for a proposal, they responded that they had none. Transcript of Oral Argument (Nov. 22, 1999) at 117. DRA's position at argument (and its threat to delay the

settlement process by appealing my ruling on the notice issue)—particularly when considered in light of its contemporaneous request for substantial attorneys' fees and the lateness of the hour in which it filed its notice objection—suggested to me that DRA was more interested in procuring for itself some influence regarding the ultimate allocation of the settlement fund to organizations such as itself, than in truly correcting any alleged deficiencies in notice to the disabled. This suggestion was further supported by the fact that the objection itself was styled a "conditional" objection, with the clear implication that, notwithstanding the existence of what DRA would have me conclude is a fatal defect in the notice plan, DRA nonetheless would withdraw its objection altogether if I order the *cy pres* distributions. I nonetheless invited counsel to submit a concrete notice plan that would effectively address all or most of the concerns raised above at a reasonable expense to the settlement fund. While counsel for DRA had no such plan available for submission at oral argument, he agreed that DRA would work on one and submit it for consideration as soon as possible.

To date, DRA has failed to submit a concrete notice plan with anything approaching the level of specificity that I requested at argument and that is needed to justify further expenditures from the settlement fund on notice and/or an extension of the opt-out period. On December 8, 1999, DRA sent a letter to plaintiffs' class counsel proposing that settlement funds be allocated (i) to "hire a person with a budget and a small support staff for the next three to four months to focus exclusively on notice and outreach to disability class members"; (ii) to "make special efforts to reach the deaf community," including by Internet links and web pages; (iii) to "focus on the German disability groups" by "arrang[ing] some sort of a published and/or Internet notice" through a German disability organization that DRA represents; (iv) to "try to reach institutionalized people with disabilities in at least Germany" by getting lists of such institutions from the German government; and (v) to "reach at least some of the organizations in the United States" by publishing notice in "several of the major disability-specific publications." Letter of Sid Wolinsky, Esq. to Burt Neuborne, Esq. (Dec. 8, 1999) at 1–2. This proposal is far from concrete, and, with the exception of calling for expenditures to hire a number of additional personnel to work on notice to the disabled, appears merely to restate DRA's initial ground for objection that disability organizations should be specifically targeted for notice. Targeting notice to disability groups, however, would not necessarily reach most, or even any, disabled victims, and even less so their heirs. As succinctly stated in the sworn report of one of the notice administrators in this case:

> The nature of the class description provides no reason to believe that current mentally or physically disabled populations in general bear any connection to those that were mentally or physically disabled during the class period. Therefore, any special notice activity directed to any of these current day communities or organizations beyond which was done, would carry little expected benefit. (i.e., one could gather a group of people at random and have just as much success finding a survivor or heir of a Holocaust era mentally or physically disabled person, as one would by targeting today's mentally or physically disabled populations, organizations, or in publications written for them.)

Report of Todd B. Hilsee on Analysis of Overall Effectiveness of Notice Plan (Nov. 4, 1999) ¶ 17(e).

Moreover, DRA has submitted no evidence in this case that the notice plan as implemented failed to reach significant numbers of survivors with disabilities (or their heirs). To the contrary, it appears from the notice administrator's report that disabled "survivors and heirs were effectively notified through extensive mainstream Paid and Earned Media, which they read as much as any other adult in the countries in which they reside." *Id.* As summarized by Ms. Cabraser at argument:

> [T]his program did what no other program that I know of had ever done before, including notice programs that specifically dealt with a settlement of disabled claims, and solely with those claims. And that included delivering notices to the homes of the homebound. Professor Neuborne had nearly 100 volunteers visit over 500 persons in their homes to help them with the notice and the questionnaire
> . . .
> We filed today, the declaration of notice administrator Jerry Benjamin regarding outreach to disabled Holocaust survivors. And that outreach included home visits, distribution of kits to over 8,500 organizations with special instructions to each of those organizations on how to conduct outreach to the elderly, the homebound, and disabled. Home visits. One-on-one around the world, throughout the notice program. The notice was disseminated via radio for those who could hear but could not see. . . . Each of those broadcasts specifically referred to the claims of the disabled and the opportunity for claims assistance, and this has been given. It continues to be given.

Transcript of Oral Argument (Nov. 22, 1999) at 82–83.

Memorandum and Order, dated July 26, 2000 (footnote omitted). For these reasons, I rejected DRA's objection then, and if it could be renewed—which it cannot be—I would reject it now.

DRA, and in particular its lead attorney, Sid Wolinsky, was predictably upset by the honest and straightforward language in my decision denying its objection. Mr. Wolinsky asked that I remove this analysis from my opinion—not because it was incorrect, but because it was hurtful. I told Mr. Wolinsky that only if the DRA objection were withdrawn unconditionally would I even consider his request. I made him no promises. Mr. Wolinsky then wrote me to clarify that DRA's prior withdrawal of its objection was intended as an unconditional withdrawal. The letter stated, in its entirety:

> Dear Judge Korman:
> Disability Rights Advocates would like to clarify that its previously submitted "Withdrawal of All Previously Asserted Objections," originally sent to you on July 5, 2000, was an unconditional withdrawal. Please do not hesitate to contact me if you have any questions.
> Sincerely,
> Sid Wolinsky

Letter from Sid Wolinsky to Judge Korman, dated July 31, 2000. Again, the intent was clear: Mr. Wolinsky wanted me to remove the portion of my opinion that denied DRA's objections and described its actions in this case. Although everything I wrote was accurate and I continue to stand by it, and although I was unwilling to negotiate over the language of my opinion, I ultimately removed the relevant section from my final published judgment approving the Settlement Agreement because my intention was never to harm an organization that appeared to be engaged

in advocating for the disabled. *See In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d. 139. I should not have been so kind.

Now, four years later, with the notice plan long completed and about half of the Settlement Fund distributed or allocated, Mr. Wolinsky seeks to reinstate DRA's objection that he unconditionally withdrew and that I already rejected on the merits. While the relief he seeks is now unattainable, Mr. Wolinsky's characterization of his earlier actions is troubling and warrants comment. Mr. Wolinsky writes:

> As the Court is aware, DRA's initial withdrawal of objections to Notice in July 2000 (without prejudice) was in the context of specific commitments made by Lead Class Counsel to DRA. Class Counsel proposed an allocation of 1% of the total settlement funds in the form of a *cy pres* remedy to benefit persons with disabilities. This commitment was reaffirmed on at least 7 separate occasions in the ensuing years. As a Court of equity, this Court should take into account the promise made. DRA should not be precluded from reasserting objections when the promised basis for the withdrawal of objections failed to materialize. This of course, aside from the issue of whether an objection to fundamental defects in the notice procedures, with serious jurisdictional and due process implications, can ever be precluded.

DRA Motion, at 1 n. 1.

First, DRA's initial withdrawal of its objections to the notice plan was clearly not "without prejudice" to renew as it now contends. It is questionable whether the withdrawal of an objection to a notice plan brought a day before the deadline for objections and in the final phase of the notice plan could ever be "without prejudice." At the very least, where that objection is never appealed, four years pass, and the notice plan is completed, any earlier withdrawal would effectively become "with prejudice." In any event, there is no question of the significance of DRA's initial withdrawal. As Mr. Wolinsky made clear in his July 31, 2000 submission, after my initial judgment approving the settlement had been issued, the initial withdrawal was "unconditional." Letter from Sid Wolinsky to Judge Korman, dated July 31, 2000. Unconditional does not mean "without prejudice." It means unconditional. Mr. Wolinsky's attempt to reimpose this objection without even acknowledging his July 31, 2000 letter is sanctionable.

Second, DRA's claim that it should be allowed to renew its objection because its initial withdrawal "was in the context of specific commitments made by Lead Class Counsel to DRA," is meritless. It is true that after DRA's initial withdrawal, Professor Neuborne wrote to DRA that, "I have recommended to the Court and to the Special Master that a payment of $12.5 million be made from the settlement fund in acknowledgment of the suffering of disabled victims of the Holocaust." Letter from Professor Neuborne to Sid Wolinsky, dated July 6, 2000 (appended to DRA Motion). But in his letter to Mr. Wolinsky, Professor Neuborne wrote that, "[t]he Court will, of course, have the final word in accordance with existing Second Circuit precedent." *Id.* And more to the point, the follow-up letter from Mr. Wolinsky, which clarified that the withdrawal was "unconditional," eliminated any doubt that there were no commitments made in exchange for the withdrawal. Notwithstanding the lack of such a "specific commitment," Professor Neuborne has supported DRA's motion for a *cy pres* distribution. He recommended that I allocate 1% of available residual funds for the "general benefit" of the disabled community "as a symbolic recognition of [its] victimization." Neuborne Declaration, dated April 2, 2004, at ¶ 8. The only difference between his

recommendation and the requested allocation of DRA is that, particularly in light of the fact that currently disabled survivors are the principal beneficiaries of the Special Master's plan of allocation, Professor Neuborne was more realistic in terms of the amount of money requested and the requirements of the law.

Regardless, passing over the fact that I never made a promise to DRA and the fact that DRA confirmed that its withdrawal was unconditional, this "context of specific commitments" argument by DRA simply reinforces the fact that DRA's objections were nothing more than a hold-up. DRA complained about the notice plan I utilized in the same breath that it stated that the notice could not be fixed because "these individuals are inherently difficult to reach." Conditional Objection, at 9. DRA's basic premise was that notice to disabled victims of Nazi persecution was impossible, and I should therefore fund programs that would assist the disabled community generally. But as I explained above and in my initial judgment approving the Settlement Agreement, this proposal was not a proposal to fix the notice problem. It was a proposal to make DRA's "conditional objection" disappear by giving DRA two things: Influence over a fund of money designated for disability rights generally and an exorbitant legal fee. Indeed, apparently recognizing the awkwardness of its position, some two weeks after the oral argument on its objection DRA submitted a letter pledging to donate any award of attorneys' fees that it may receive to one or more other charitable organizations over which DRA has no control for the purpose of funding a museum or other type of exhibit memorializing the experiences of disabled persons who were victims of the Holocaust. *See* Letter from Sid Wolinsky to Judge Korman, dated December 15, 1999. Neither the proposed allocation, nor the philanthropic use of its counsel fees, sought to assist victims

of Nazi persecution. But now that DRA has not obtained the influence or fees it desired—the money instead going to well over a hundred thousand victims of Nazi persecution who are both needy and disabled—DRA seeks to revive its earlier objection.

Third, DRA is wrong to suggest that, because it alleges "fundamental defects in the notice procedures, with serious jurisdictional and due process implications," its objection can never be precluded. DRA Motion, at 1 n. 1. The unconditional withdrawal of the objection, the passage of four years, and the distribution or allocation of about half of the Settlement Fund does preclude it from raising the objection here. By waiting, DRA has made impossible any "remedy" other than the one it has proposed all along—a *cy pres* distribution targeting disabled people who are not members of the plaintiff class, which is not in fact a remedy to the notice plan and is of questionable legal propriety. Of course, the thinly disguised reality is that Mr. Wolinsky has never wanted to argue that a lack of notice precludes the releases or should be corrected—he has only sought to use the argument as leverage to coopt the settlement. That said, I agree that if my rejection of DRA's objection was erroneous, disabled individuals could bring a future action against the defendants released in this action, and they would not be precluded *in that separate action* from collaterally attacking the preclusive effect of the settlement by arguing the fundamental jurisdictional point that the lack of notice here prevents the enforcement of the releases. After all, releases are only enforceable to the extent of notice provided to class members. *See National Super Spuds v. N.Y. Mercantile Exchange*, 660 F.2d 9, 17–18 (2d Cir.1981); *see generally* Newberg on Class Actions §§ 8.3, 16.31.

In any event, DRA's attempt to renew its conditional objection to the notice plan is rejected. DRA's most recent filing adds nothing to its prior attempt to hold up the settlement through its conditional objection. Instead, the objection continues to rest on the misperception that the only way to account for the fact that survivors who were once targeted for Nazi persecution because of their disability are hard to find is to award a separate *cy pres* distribution to serve the disability community generally rather than providing direct relief to needy survivors of Nazi persecution who are now disabled. I have addressed this misperception before, *see In re Holocaust Victim Assets Litig.*, 2004 WL 717243 (E.D.N.Y., April 2, 2004), but because of DRA's stubborn persistence, I will address it again below.

### Part II: DRA's Objections to my Allocation Decisions

I now turn to the merits of DRA's motion for reconsideration of my April 2, 2004 memorandum and order and its objections to my present and future allocation decisions. Although the arguments made by this motion and these objections are answered completely by my April 2, 2004 opinion, *see In re Holocaust Victim Assets Litig.*, 2004 WL 717243, I will address certain frivolous and misleading statements by DRA that may otherwise burden the record.

DRA writes: "[C]ompensation efforts to date have resulted in benefits to Jewish and Romani victim groups within the Looted Assets Class greatly disproportionate to that of the disability victim group. These distributions represent an increasing deviation from the stated purpose of the Looted Assets Class." DRA Motion, at 4. Of course, DRA does not actually set forth the "stated purpose of the Looted Assets Class." Instead, it provides the Looted Assets Class's definition. The Looted Assets Class is defined as:

Victims or Targets of Nazi Persecution and their heirs, successors, administrators, executors, affiliates, and assigns who have or at any time have asserted, assert, or may in the future seek to assert Claims against any Releasee for relief of any kind whatsoever relating to or arising in any way from Looted Assets or Cloaked Assets or any effort to recover Looted Assets or Cloaked Assets.

Settlement Agreement, Section 1. The *purpose* of the Looted Assets Class was "for members of the Looted Assets Class ... to recover the value of assets that were looted by the Nazis and passed through Swiss banks." *In re Holocaust Victim Assets Litig.*, 2004 WL 717243, at *10. I explained this in my opinion denying DRA's proposal:

[T]here is a conceptual flaw in ... DRA's proposal. [DRA] recognize[s] (correctly) that ... disabled targets of Nazi persecution are entitled to distributions through the Looted Assets Class and each of the other classes. But these victims are only entitled to such distributions as individuals—not as a group. There are no sub-classes within the Looted Assets Class or any other class. As I explained in my memorandum of March 9, 2004, there is no United States survivors' share. *See In re Holocaust Victim Assets Litig.*, 2004 WL 423186, at *19. Similarly, there is ... no disabled victims' share. All victims of the Nazis were presumed looted, and all had an equal right to allocation through the Looted Assets Class. Put differently, the original purpose was to provide restitution to each individual victim, irrespective of why he or she was targeted by the Nazis; thus, the allocation to the Looted Assets Class will be successful or unsuccessful based on how much meaningful restitution it can provide to members of the class, regardless of whether

it perfectly reflects the target group breakdown of Nazi victims.

Id. at *11. The purpose of the Looted Assets Class was not, as DRA suggests without support, "acknowledgment of the victims' suffering." Therefore, the current distribution—which provides funds to the neediest survivors of Nazi persecution (almost all of whom are now disabled) regardless of their target group—does not "represent an increasing deviation from the stated purpose of the Looted Assets Class." DRA Motion, at 4.

Moving beyond the "stated purpose of the Looted Assets Class," to a Due Process and fundamental fairness claim, DRA writes: "It is fundamentally unfair for *all* funds to go to Jewish and Romani class members to the exclusion of the disability victim group, simply based on the identification results of the IOM." DRA Motion, at 19. First, the distribution is not "simply based on the identification results of the IOM." The distribution is based on all needy survivors identified by anyone. DRA has never suggested practical ways in which we could find more disabled victims of Nazi persecution, and it has never itself pointed to needy disabled survivors we have not found. But second, and more importantly, there is simply nothing unfair about giving the money to the neediest surviving members of the Looted Assets Class (almost all of whom are now disabled) irrespective of why they were targeted by the Nazis. Disabled survivors who were targeted by Nazis because of their disability have not been excluded, as DRA suggests. They have been treated precisely the same as all other victims of Nazi persecution—if they can prove membership in a plaintiff class, they are compensated.

Moreover, DRA and Mr. Wolinsky must remember the original purpose of the Deposited Assets Class. The money that DRA now claims must be diverted to fund DRA's proposal promoting general disability rights in order to avoid a "fundamentally unfair" result would come from residual funds allocated but not distributed to the Deposited Assets Class. The purpose of the Deposited Assets Class was for victims or targets of Nazi persecution, or their heirs, to recover property once held in Swiss banks that was either improperly transferred to the Nazis or never paid to the account holder. Should any residual funds that exist—money that belonged primarily to Jewish families slaughtered in the Holocaust—not be distributed to disability rights organizations with no connection to Nazi survivors, there will be nothing "fundamentally unfair" about it. To the contrary, it would be just. Six million Jews were murdered in the Holocaust, one third of the worldwide Jewish population. Those relatively few that survived—all of whom faced unspeakable horrors and almost all of whom are now disabled—deserve whatever compensation they can receive from this fund. Whether they are more deserving than the disabled individuals who never endured the Holocaust whom DRA proposes to assist is an issue that DRA is free to debate. But it is clear is that, as a legal matter, the disabled individuals and organizations DRA proposes to help have no right to benefit from a settlement to which they are strangers. Their existence does not make the distributions to actual Jewish, Romani, and other victims of Nazi persecution "widely disproportionate" or "unfair."

In the end, all of this analysis is unnecessary because DRA simply cannot claim that the distribution decisions in this case have not benefitted disabled victims. Thus far, the money allocated to the Looted Assets Class—not to speak of the money allocated to the Slave Labor and Refugee Classes—has assisted over 100,000 of the neediest survivors of Nazi persecution. And as the DRA itself concedes, "it is

reasonable to assume that well over 90% of all Holocaust survivors are also now persons with disabilities." DRA Proposal at 19. Indeed, a substantial portion of the money set aside for four of the five classes of plaintiffs (all but the Deposited Assets Class) has gone almost exclusively to disabled victims of Nazi persecution. As I stated in my initial rejection of DRA's proposal, "[w]hile most of these disabled survivors may not have been originally targeted by the Nazis because of a disability, by the DRA's own admission, these people now 'all likely suffer[ ] from the same root cause of prejudice and discrimination experienced by those persons who had disabilities during the Nazi era.'" *In re Holocaust Victim Assets Litig.*, 2004 WL 717243, at *12. The individuals DRA proposes to help directly and indirectly through its proposal are also disabled and also face prejudice, but they differ in one critical respect from the individuals who have been helped thus far: They are not members of the plaintiff class. Indeed, were I to grant DRA's proposal, I would have no justification for denying a similar distribution to large numbers of needy Jews who are not survivors—for example, each of the approximately 225,000 identified needy elderly Jews living in the FSU rather than only the 126,000 needy survivors—simply because they are needy. *See e.g.*, Judah Gribetz and Shari C. Reig, Special Master's Recommendations for Allocation of Possible Unclaimed Residual Funds, Annex E "Summary of Selected Demographic Analyses," at E–15. I have drawn the line between needy members of the class and needy individuals who are not members of the class because, with so many needy members of the plaintiff class identifiable, it is legally required and morally justified.

Part of the reason for DRA's continued objections appears to be its belief that, even if we could find survivors of Nazi persecution who were targeted on the ba-

sis of disability, it would better to give DRA the funds than to give these survivors the funds. It contends, "humanitarian aid can often be a detriment to the advancement and well being of persons with disabilities by perpetuating institutionalization and stigmatization." DRA Motion, at 6. While this may be the best way to combat the problems facing disabled people generally, I disagree that this is the proper analysis given the individual plaintiffs in this case. Any individual survivors of Nazi persecution who were targeted on the basis of disability will be over sixty years old. On average, they will be significantly older. These are people who need money to survive in their final years and who cannot wait around for long-term goals of improving the social standing of disabled people everywhere.

### Part III: DRA's Objection to Class Counsel

Next I turn to DRA's claim that my denial of its request for *cy pres* relief "call[s] into question the adequacy of representation of the Looted Assets Class, and the ability of Class Counsel to 'fairly and adequately protect the interests of the class' as mandated by Federal Rule of Civil Procedure 23(a)(4) and the Due Process Clause of the Constitution." DRA Motion, at 17. DRA writes:

> The increasingly divergent interests of the victim groups in the Looted Assets Class created an inherent conflict of interest, thereby unfairly jeopardizing the rights and interests of class members with disabilities. Class members could no longer be adequately represented by existing Class Counsel.

DRA Motion, at 17–18. This argument, which is made by an entity seeking to divert money from class members to strangers, takes considerable chutzpah. It is answered by my discussion above and my opinion from April 2, 2004, *see In re*

*Holocaust Victim Assets Litig.*, 2004 WL 717243, both of which explain that the interests of disabled members of the class are indeed being protected by the current allocation scheme.

More significantly, I specifically addressed and rejected this argument in my judgment approving the Settlement Agreement, which DRA did not challenge and from which it did not appeal. I wrote: "The appointment of a Special Master here also obviates the concern that hypothetical conflicts among class members relating to allocation and distribution would require separate representation, and thus call into question the adequacy of representation. This is so because the class members *represent themselves* on this key issue, and have direct access to the Special Master and to me." *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d at 150. This wisdom has been borne out in recent months, when dozens of proposals for the distribution of unclaimed residual funds, representing a wide variety of plaintiff interests, have been filed—often by competent counsel. *See www.swissbankclaims.com.* The Special Master, along with the Deputy Special Master, scrupulously reviewed these proposals and issued a recommendation incorporating and balancing all plaintiff interests. *See* Judah Gribetz and Shari C. Reig, Special Master's Recommendations for Allocation of Possible Unclaimed Residual Funds.

### Part IV: The Standing of DRA to Object

Finally, I turn to the question of whether DRA even has standing to object to the Plan of Allocation. In short, it does not. DRA is a non-profit law center founded to represent individuals with disabilities. DRA has no connection to the Holocaust. Nor has it ever produced a client who is a member of the plaintiff class. It states in the introduction to its latest motion: "On behalf of the 3 individual Holocaust survivors and the coalition of 17 organizations represented by DRA, DRA objects to specific actions taken by the Court." DRA Motion, at 1. But none of these three individuals have ever been identified. And none have shown that they would be benefitted monetarily if DRA's *cy pres* proposal were adopted. Indeed, I would be surprised if these individuals were fully aware of the manner in which DRA has conducted itself in this case. Similarly, none of the organizations DRA claims it represents have been shown to bear any connection to disabled Holocaust survivors.

Even if DRA could identify three individual Holocaust survivors as clients, that alone would not confer standing upon them to challenge the Plan of Allocation. These survivors would have to show membership in one of the five plaintiff subclasses. While all survivors of Nazi Persecution are presumed members of the Looted Assets Class for allocation purposes, that does not mean that they are in fact members of the Looted Assets Class with standing to object. As the Special Master explained in his original proposed plan of allocation:

> The Settlement Agreement indicates that only those who have asserted or may assert claims against a Releasee can claim membership in the "Looted Assets Class," i.e., that only those "Victims or Targets of Nazi Persecution" who were looted, and whose stolen property actually or allegedly was sent to or through Switzerland or Swiss entities, are entitled to participate in this Settlement.

Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds, at 111. If a survivor cannot show that his or her assets were looted and that those specific assets were "sent to or through Switzerland or Swiss entities," he or she lacks standing. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89,

116–17 (E.D.N.Y.2004). Because of the importance of this case and because of the difficulties of proving actual membership in the plaintiff class, I would never refuse to consider a meritorious claim or objection merely because a party lacked standing. *See e.g., id.* But here, where DRA never made a meritorious objection, it is worth noting that it also never showed that it had standing to object in the first place.

## CONCLUSION

DRA closed its motion by writing that "[p]eople with disabilities during the Holocaust who suffered sterilization—forever shamed, and those exterminated-forever silenced—deserve recognition." DRA Motion, at 25. DRA has made this statement repeatedly, and I could not agree more. What the Nazis did to disabled individuals throughout the Holocaust was hideous, and the continued persecution disabled individuals have faced in the decades since is shameful. But that has no bearing on the questions in this litigation—a lawsuit about returning money to those individuals from whom Swiss banks profited. In sum, I will not allow DRA to co-opt the settlement by using this emotional fact to force a distribution that would benefit DRA far more than the rightful plaintiffs in this case.

There is a line from Deuteronomy that reads, "Justice, justice shall you pursue, that you may thrive." *Deuteronomy* 16:20. Commentators speculate as to why the word justice is repeated. The answer that I find most appealing is that the repetition serves as a reminder that, even in the pursuit of a just cause, just means must be used. *See Etz Hayim; Torah and Commentary,* 1088–89 (David L. Lieber, ed., The Rabbinical Assembly 2001). While DRA's cause may be just, its means are not.